[No. A123891. First Dist., Div. Three. June 8, 2010.]

WALGREEN CO., Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(a) and 8.1110, this opinion is certified for publication with the exception of part III.

## COUNSEL

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Brett H. Oberst and Rebecca Justice Lazarus for Plaintiff and Appellant.

Dennis Herrera, City Attorney, Wayne Snodgrass and Vince Chhabria, Deputy City Attorneys, for Defendants and Respondents.

Francisco J. Silva and Long X. Do for California Medical Association and San Francisco Medical Society as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**McGUINESS, P. J.**—In this appeal we consider a challenge to an ordinance enacted by the City and County of San Francisco (the City) banning the sale of tobacco products in certain retail establishments that contain a pharmacy. The ordinance is premised on the notion that a retail store conveys tacit approval of tobacco use when it sells prescription drugs as well as tobacco products. Appellant Walgreen Co. (Walgreens) contends the ordinance violates the equal protection clauses of the federal and state Constitutions, arguing there is no rational basis for prohibiting its stores with pharmacies from selling tobacco products while allowing such sales at "general grocery" stores and "big box" stores that contain pharmacies. Walgreens also claims the ordinance must be invalidated because the City's Office of Economic Analysis (OEA) abused its discretion by failing to prepare a report on the economic impact of the legislation, a purported violation of voter-enacted Proposition I.

■ We conclude the OEA's failure to prepare an economic impact report does not permit an interested party such as Walgreens to invalidate a duly enacted ordinance. The cause of action premised on failure to comply with Proposition I therefore fails as a matter of law. However, we agree with Walgreens that its complaint adequately states a cause of action alleging an equal protection violation. The issue is a close one only because the deferential rational basis test guides our equal protection analysis. Nevertheless, even under that deferential standard, the challenged distinction among stores containing licensed pharmacies is not fairly related to the object of the prohibition on sales of tobacco products. There is no rational basis to believe the supposed implied message conveyed by selling tobacco products at a Walgreens that has a licensed pharmacy in the back of the store is different in any meaningful way from the implied message conveyed by selling such products at a supermarket or big box store that contains a licensed pharmacy. Accordingly, we reverse in part the judgment of the trial court sustaining the City's demurrer without leave to amend.

### FACTUAL AND PROCEDURAL BACKGROUND

The legislation challenged in this appeal, City Ordinance No. 194-08 (hereafter the ordinance), amended the San Francisco Health Code to provide that "No person shall sell tobacco products[1] in a pharmacy, except as provided in [San Francisco Health Code] Section 1009.93." (S.F. Health Code, § 1009.92.) The term "pharmacy" is defined in the ordinance to refer to

---

[1] "Tobacco Product" is defined as "any substance containing tobacco leaf[,] including but not limited to cigarettes, cigars, pipe . . . tobacco, snuff[,] chewing tobacco, and dipping tobacco." (S.F. Health Code, § 1009.91, subd. (f).)

the entire retail establishment that includes the portion normally referred to as a pharmacy, giving rise to some confusion in terminology.[2] To avoid confusion and be consistent with the language of the ordinance, we shall refer to the section of a retail establishment in which a licensed pharmacist prepares and sells prescription pharmaceuticals as a "licensed pharmacy," in contrast to the entire store containing a licensed pharmacy, which the ordinance labels a "pharmacy." The prohibition on sales of tobacco products is not limited to the licensed pharmacy portion of a store but instead applies to the establishment as a whole.

In addition to traditional independent pharmacies, which sell little more than prescription drugs, over-the-counter medications, and personal care items, the term "pharmacy" encompasses chain stores, supermarkets, and big box stores that sell a variety of products such as food, beverages, paper goods, and miscellaneous items in addition to prescription drugs. However, although a "general grocery store"[3] or a "big box store"[4] that contains a licensed pharmacy qualifies as a "pharmacy" under the ordinance, the ordinance specifically excludes these establishments from the prohibition on sales of tobacco products. (S.F. Health Code, § 1009.93.) As a result, the ordinance prohibits a Walgreens that contains a licensed pharmacy from selling tobacco products but imposes no such limitation on a Safeway supermarket or a Costco big box store that contains a licensed pharmacy.

The legislative findings associated with the ordinance cite the adverse health effects associated with tobacco use. The principal finding upon which the ordinance is premised states: "Through the sale of tobacco products, pharmacies convey tacit approval of the purchase and use of tobacco products. This approval sends a mixed message to consumers who generally patronize pharmacies for health care services . . . ." (S.F. Ord. No. 194-08.)

---

[2] "Pharmacy" is defined as "a retail establishment in which the profession of pharmacy by a pharmacist licensed by the State of California in accordance with the Business and Professions Code is practiced and where prescriptions are offered for sale. A pharmacy may also offer other retail goods in addition to prescription pharmaceuticals. For purposes of this Article, 'pharmacy' includes retail stores commonly known as drugstores." (S.F. Health Code, § 1009.91, subd. (e).)

[3] "General Grocery Store" is defined to have "the same meaning as set forth in [San Francisco] Planning Code Section 790.102(a) or any successor provisions." (S.F. Health Code, § 1009.91, subd. (c).) Section 790.102, subdivision (a)(1) of the San Francisco Planning Code, in turn, defines "general grocery store" as "[a]n individual retail food establishment that: [¶] (A) Offers a diverse variety of unrelated, non-complementary food and non-food commodities, such as beverages, dairy, dry goods, fresh produce and other perishable items, frozen foods, household products, and paper goods; [¶] (B) May provide beer, wine, and/or liquor sales for consumption off the premises . . . ; (C) Prepares minor amounts or no food on-site for immediate consumption; and [¶] (D) Markets the majority of its merchandise at retail prices."

[4] "Big Box Store" is defined as "a single retail establishment occupying an area in excess of 100,000 gross square feet." (S.F. Health Code, § 1009.91, subd. (a).)

As further support for the ordinance, the City's Board of Supervisors (board of supervisors or Board) also found that "[p]harmacies and drugstores are among the most accessible and trusted sources of health information among the public . . . ," and that "[c]linicians can have a significant effect on smokers' probability of quitting smoking . . . ." (*Ibid.*)

As reflected in the legislative findings, various medical and pharmaceutical organizations advocate prohibiting sales of tobacco products in pharmacies. Among the organizations supporting such a prohibition are California's Tobacco Education and Research Oversight Committee, the American Pharmacists Association, the California Pharmacists Association, and the California Medical Association. As far back as 1970 the American Pharmaceutical Association declared that "mass display of cigarettes in pharmacies is in direct contradiction to the role of a pharmacy as a public health facility."

As support for distinguishing between chain drugstores,[5] on the one hand, and general grocery stores and big box stores on the other hand, the ordinance contains a finding that prescription drug sales comprise a much larger part of the business of chain drugstores, as follows: "Prescription drug sales for chain drugstores represent a significantly higher percentage of total sales than for grocery stores and big box stores that contain pharmacies. According to the 2007 Rite Aid[] Annual Report, prescription drug sales represented 63.7% of total sales in fiscal 2007. Walgreen's 2007 Annual Report documented prescription sales as approximately 65% of net sales that year. Pharmacy sales at Safeway have been estimated at 7.5% of annual volume. Costco's prescription sales generated 1.5% of total revenue in 2002."

During public hearings on the ordinance, one of its main proponents, Dr. Mitchell Katz, the City's director of public health, addressed why the legislation was directed at only certain stores containing licensed pharmacies. Dr. Katz explained: "Well, you know, shouldn't you include all stores [containing licensed pharmacies]. If you're going to do this, you know, let's be fair, look at all stores. But I ask you, in your own experience, if we stop people going into a Walgreens, going into a Rite-Aid, going into one of these independent pharmacies and said, What kind of store are you going into? [T]hey would say, Pharmacy. If you stop someone going into a supermarket, and [say], What kind of store are you going into? [E]ven a supermarket that has a drugstore, they'd say, I'm going into a supermarket. And that's the social perceptibility difference. . . . You can see as a total of sales that

---

[5] Neither the ordinance nor the legislative findings define the terms "drugstore" or "chain drugstore." Nevertheless, based on the text of the legislative findings, the City classifies chain stores such as Walgreens and Rite Aid as "chain drugstores," whereas Safeway and Costco are not considered "chain drugstores," even though they are chains and may contain a licensed pharmacy.

Walgreens, Rite-Aid, and the two chain stores, [pharmacy sales are] their major line of work, and to me that makes a big difference in terms of how those establishments are viewed by vulnerable adolescents."

When asked during a Board of Supervisors meeting why the legislation did not cover all stores containing a pharmacy, Dr. Katz responded as follows: "What I was trying to do in our work in fashioning the legislation was focusing on the group where I thought the case was strongest. We all go to supermarkets. We all go to warehouse stores. They get a cross section of people. We teach our children that supermarkets, wholesale stores, they're places you to go to buy everything. When it comes [to] pharmacies, I feel that our children, our teenagers get a different message. . . . What we're trying to say is these places market themselves as health-promoting businesses. They're not Walgreens General Store. They're not Rite Aid. They're Walgreens pharmacy. They're Rite Aid pharmacy. The ['P]harmacy America [T]rusts' and so it sends a very different message. Certainly in the future if we have success and I believe we would, just like San Francisco was the leader and then broaden[ed] the legislation . . . around second hand smoke. . . . [W]e focus on that group we thought was most compelling."

On September 8, 2008, Walgreens filed a complaint seeking to invalidate the ordinance. Walgreens also moved for a preliminary injunction to prevent the ordinance from taking effect. The trial court denied the application for a preliminary injunction on September 30, 2008. The ordinance took effect the following day. Walgreens thereafter filed a first amended complaint (hereafter the complaint).

The complaint contains three causes of action. The first and second causes of action allege violations of the equal protection clauses of the United States and California Constitutions, respectively. Walgreens alleges the ordinance "prohibits some retail establishments with [licensed] pharmacies from selling tobacco products, but arbitrarily exempts from this prohibition other retail establishments with [licensed] pharmacies, namely, general grocery stores and big box stores," in violation of constitutional equal protection guarantees. The third cause of action alleges a violation of Proposition I, which the voters approved in November 2004. Proposition I directed the City to create the OEA, which is obligated to provide an economic impact report to the Board of Supervisors with respect to any proposed legislation that might have a material impact on the City. (S.F. Admin. Code, § 10.32.) Walgreens contends the failure of the OEA to prepare an economic impact report regarding the ordinance renders the ordinance invalid.

Walgreens alleges in the complaint that it operates licensed pharmacies in 52 of its 54 full-service stores in the City. The two Walgreens stores that do not operate pharmacies are exempt from the prohibition on selling tobacco. Walgreens contends that licensed pharmacies could also be found in the City at one Costco big box store, one pharmacy operated by Longs Drugs, two Lucky supermarket stores, 10 Safeway stores, and six Rite-Aid stores.[6] Walgreens asserts that its stores containing licensed pharmacies are similar in all relevant respects to the 12 grocery stores and one big box store that are specifically exempt from the ordinance. Among other things, at both Walgreens and the exempt grocery stores, the licensed pharmacy is located in the back of the store, whereas prior to the effective date of the ordinance tobacco products were sold in the front of Walgreens Stores. Tobacco products were not sold by pharmacists at Walgreens but instead were "clerk served," meaning that a customer would have to request to purchase a tobacco product from a clerk or checkout attendant. According to Walgreens, both stores subject to the ordinance and those exempt from it typically advertise themselves as health promoting and have signage on the outside of the store advertising the pharmacy within. Walgreens alleges that, like stores exempt from the ordinance that do not devote a significant percentage of their floorspace to their pharmacies, it devotes only 9 percent of the total "front area" of its stores to the pharmacy. Walgreens also asserts that 90 percent of the transactions at Walgreens's stores in the City do not involve an item from the licensed pharmacy and, in contrast to legislative findings indicating that 65 percent of Walgreens's net sales were attributable to prescription items, nonpharmacy sales accounted for slightly less than half (46.7 percent) of Walgreens's sales at its stores in the City during a one-year period ending in July 2008.

---

[6] The complaint neglects to mention independent pharmacies covered by the ordinance. Dr. Katz testified that there were 16 independent pharmacies in the City at the time the ordinance was enacted. Only four of those independent pharmacies were still selling tobacco products at the time the ordinance was enacted. In its briefing to this court, Walgreens states that it purchased the six Rite-Aid pharmacies located in the City following enactment of the ordinance, leaving it with 58 stores covered by the ordinance. Walgreens asserts it has "58 of the approximately 63 pharmacy establishments covered by the Ordinance." Walgreens's estimate of the total number of pharmacies covered by the ordinance is derived by adding Walgreens's 58 stores to the one operated by Longs Drugs and the four independent pharmacies that were selling tobacco products at the time the ordinance was enacted. Walgreens's tally omits the 12 independent pharmacies that had voluntarily chosen not to sell tobacco products even before the ordinance was enacted. Regardless of how one calculates the number of pharmacies subject to the ban on sales of tobacco products, the fact remains that, following its purchase of Rite-Aid drugstores in the City, Walgreens operates over three-quarters of the pharmacies covered by the ordinance (58 out of approximately 75), including all but one of the chain drugstores prohibited from selling tobacco products.

In a demurrer to the complaint, the City contended the ordinance passes constitutional muster because the exclusion of general grocery stores and big box stores from the ban on sales of tobacco products is rationally related to a legitimate governmental interest. The City also claimed the ordinance is not invalid under Proposition I, reasoning that, while the law imposes an obligation upon the OEA to prepare and submit an analysis to the Board of Supervisors, the Board does not require an OEA analysis before enacting legislation. According to the City, the proper remedy for the failure to comply with Proposition I is a writ of mandate directing the OEA to prepare an economic impact report.

The trial court sustained the City's demurrer without leave to amend. Walgreens timely appealed following entry of judgment in the City's favor.

## DISCUSSION

### I. *Standard of Review*

"On review of an order sustaining a demurrer without leave to amend, our standard of review is de novo, 'i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.' [Citation.]" (*Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.* (2003) 105 Cal.App.4th 1441, 1445 [130 Cal.Rptr.2d 392].) " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.]' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) "We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citations.] We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale. [Citation.]" (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631 [27 Cal.Rptr.3d 452].)

### II. *Equal Protection*

Walgreens contends the challenged ordinance violates the equal protection clauses of the federal and state Constitutions, asserting that the disparate treatment of different types of stores containing pharmacies is not rationally related to a legitimate legislative end. For the reasons that follow, we agree that Walgreens's complaint adequately states an equal protection violation.

## A. *Applicable Legal Principles*

■ The Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The California Constitution likewise prohibits the denial of equal protection.[7] (Cal. Const., art. I, § 7, subd. (a).) " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' [Citation.]" (*In re Eric J.* (1979) 25 Cal.3d 522, 531 [159 Cal.Rptr. 317, 601 P.2d 549].) A corporation is considered a "person" entitled to the constitutional guarantee of equal protection. (*National General Corp. v. Dutch Inns of America, Inc.* (1971) 15 Cal.App.3d 490, 495, fn. 3 [93 Cal.Rptr. 343].)

■ " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654].) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.]" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696].)

The City concedes that, for purposes of the challenged ordinance, all retail establishments containing licensed pharmacies are similarly situated. This concession is not dispositive of Walgreens's equal protection challenge but merely constitutes an acknowledgement that Walgreens has met its threshold burden to show that the different types of stores containing licensed pharma-

---

[7] In addressing Walgreens's constitutional claims, we consider decisions of the United States Supreme Court and other federal courts as persuasive authority because the equal protection provision of the California Constitution is " 'substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution.' " (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571 [117 Cal.Rptr.2d 168, 41 P.3d 3].) While it is true the equal protection provisions of the California Constitution are " 'possessed of an independent vitality' " and in a given case may demand an analysis different from that applicable under the Fourteenth Amendment of the United States Constitution (*Serrano v. Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929]), the California Supreme Court has rejected the notion that the rational basis test is more rigorous under California law than under federal law. (See, e.g., *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481 [97 Cal.Rptr.2d 334, 2 P.3d 581] [adhering to federal rational relationship test in face of claim it did not adequately express the state constitutional guarantee].)

cies are " 'sufficiently similar to merit application of some level of scrutiny to determine whether distinctions between the two groups justify the unequal treatment.' [Citation.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200 [39 Cal.Rptr.3d 821, 129 P.3d 29] (*Hofsheier*).) The next step in the analysis is to determine the appropriate level of scrutiny to apply.

■ "In resolving equal protection issues, the United States Supreme Court has used three levels of analysis. Distinctions in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest. Classifications based on gender are subject to an intermediate level of review. But most legislation is tested only to determine if the challenged classification bears a rational relationship to a legitimate state purpose. [Citations.]" (*Hofsheier, supra*, 37 Cal.4th at p. 1200.) Because the challenged ordinance does not involve a suspect classification or interfere with the exercise of a fundamental right, the parties agree that the deferential "rational relationship" or "rational basis" test governs our consideration of Walgreens's equal protection claim.

■ Rational basis review " 'is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a "discrimination" or differentiation of treatment between classes or individuals. It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and "requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose." [Citation.]' " (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641 [88 Cal.Rptr.2d 283, 982 P.2d 154].) "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. [Citations.]" (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 315 [124 L.Ed.2d 211, 113 S.Ct. 2096].)

"[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it,' [citation]." (*FCC v. Beach Communications, Inc., supra*, 508 U.S. at p. 315.) " 'Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon *the party who assails it*.' [Citation.]" (*Warden v. State Bar, supra*, 21 Cal.4th at p. 641.) "But this is not an

impossible task. The rationale must be 'plausible' [citation] and the factual basis for that rationale must be *reasonably* conceivable [citation]. And 'even in the ordinary equal protection case calling for the most deferential of standards, [courts must ascertain] the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause.' [Citation.]" (*Hofsheier, supra,* 37 Cal.4th at p. 1201.)

██ "[A]lthough it is irrelevant whether the perceived reason for the challenged distinction actually motivated the Legislature, equal protection 'does require that a purpose may conceivably or "may reasonably have been the purpose and policy" of the relevant governmental decisionmaker' [citation] and that 'the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.' [Citation.]" (*Hofsheier, supra,* 37 Cal.4th at p. 1201.) Thus, "we must undertake ' " ' "a *serious and genuine judicial inquiry* into the correspondence between the classification and the legislative goals" ' " ' [citation] by inquiring whether ' "the statutory classifications are rationally related to the 'realistically conceivable legislative purpose[s]' [citation]" . . . and . . . by declining to "invent[] fictitious purposes that could not have been within the contemplation of the Legislature . . . ." ' [Citation.]" (*Ibid.*) Statutory distinctions resting on "speculative possibility" do not satisfy the requirements of equal protection. (*Id.* at p. 1204.)

### B. *Asserted Rational Grounds for Exempting General Grocery Stores and Big Box Stores from Ban on Sales of Tobacco Products*

We now turn to the question of whether there is a rational basis for exempting general grocery stores and big box stores that contain licensed pharmacies from the ban on sales of tobacco products applicable to all other retail establishments containing licensed pharmacies. We do not question the premise that the presence of a licensed pharmacy within any retail establishment provides a rational justification for prohibiting that store from selling tobacco products, but that is not the question before us. What must be decided here is whether the legitimate objectives of discouraging smoking and avoiding the suggestion that a health care purveyor approves of cigarette smoking provides a rational justification for prohibiting retail establishments such as Walgreens—which contains a licensed pharmacy in the rear of the

store—from selling tobacco products, while permitting a competing retail establishment such as Safeway or Costco—which sells many of the same products and also has a licensed pharmacy on premises—to sell the very same tobacco products.

The City defends the distinction drawn in the ordinance by asserting that the Board of Supervisors "rationally could have concluded that the sale of cigarettes by drug stores like Walgreens sends the wrong message about cigarettes *more strongly* than does the sale of cigarettes by big box stores or grocery stores, even if those stores too have pharmacies in them." (Italics added.) What the City seems to mean is that customers, particularly "impressionable young people," are more likely to perceive a tacit message that smoking is not harmful when tobacco products are sold in a store the public associates with the sale of health-related products, and a "drugstore" such as Walgreens carries such an association more so than does a supermarket such as Safeway.

The City's premise contradicts the allegation in Walgreens's complaint that "the implied message, if any, conveyed by the sale of tobacco products at a Walgreens [is not] different from the implied message, if any, conveyed by the sale of tobacco products at the exempted stores with [licensed] pharmacies." We must accept Walgreens's allegation as true in this appeal from an order sustaining a demurrer. (See *Zelig v. County of Los Angeles, supra,* 27 Cal.4th at p. 1126.) More importantly, allegations in the complaint concerning the similarities between Walgreens and general grocery stores support the contention there is no difference in any implied message that might be conveyed by selling tobacco products in the two types of stores. These allegations appear to be beyond dispute, with the City conceding that similarities exist. Thus, for example, at both Walgreens and the exempt general grocery stores, the licensed pharmacy is located in the back of the store, whereas tobacco products were sold in the front of Walgreens stores prior to the effective date of the ordinance and had to be requested from a clerk. Stores subject to the ordinance and grocery stores exempt from it typically advertise themselves as health promoting and have signage on the outside of the store advertising the licensed pharmacy within. Indeed, Safeway advertised itself as promoting "Healthy Living." Like stores exempt from the ordinance that do not devote a significant percentage of their floorspace to their licensed pharmacies, Walgreens devotes less than 10 percent of the total "front area" of its stores to the licensed pharmacy. In addition, 90 percent of the transactions at Walgreens's stores in the City do not involve a purchase from the licensed pharmacy.

Furthermore, as Walgreens points out in its complaint, the majority of its stores in the City meet the primary criteria for the ordinance's definition of "general grocery store,"[8] which the ordinance exempts from the ban on sales of tobacco products. Walgreens alleges that the majority of its stores meet the four criteria defining a general grocery store because they "(A) exceed 5,000 gross square feet; (B) offer a diverse variety of unrelated, non-complementary food and non-food commodities, such as beverages, dairy, dry goods, fresh produce and other perishable items, frozen foods, household products, and paper goods; (C) prepare no food on-site for immediate consumption; and (D) market all of their merchandise at retail prices." Walgreens purportedly does not come within the definition of "general grocery store" only because of the peculiar distinction that it is not a "retail food establishment" but instead is a retail store that sells food. The distinction apparently turns upon whether the establishment primarily sells foodstuffs.[9]

The increasingly blurred distinction between Walgreens and general grocery stores is much like the growing similarities over time between hotels and motels, which the appellate court addressed in *Gawzner Corp. v. Minier* (1975) 46 Cal.App.3d 777 [120 Cal.Rptr. 344]. There, the court held that a statute regulating the content of outdoor rate advertising by motels but not hotels violated equal protection and could not be enforced. (*Id.* at p. 791.) The proffered justification for the distinction was that hotels do not seek the business of the motoring public and therefore have no need to display rate signs to appeal to passing motorists. (*Id.* at p. 790.) The court rejected this reasoning as "patently untrue in California in the year 1975." (*Ibid.*) According to the court, "Just as motels have expanded their services to compete with hotels, hotels have added parking facilities to compete with motels." (*Ibid.*) The court concluded that although a hotel is obviously different from a motel in terms of size, diversity of services, and facilities, they both "rely to a large degree upon the motoring public for business." (*Id.* at p. 791.) Thus, "[w]ith respect to the avowed purpose of [the statute], hotels and motels are similarly situated." (*Ibid.*)

---

[8] See footnote 3, *ante.*

[9] The City offers no explanation of the product mix that would be necessary for a store to be considered a "retail food establishment," a troubling ambiguity as hybrid forms of retail stores offering food items continue to appear in the marketplace. At oral argument, counsel for Walgreens explained it would not be in a position to claim it is a "general grocery store" and that it would have been futile to pursue such a status, asserting the City takes the view a "retail food establishment" primarily sells food items. Counsel for the City did not dispute this assessment.

Likewise, based on an objective comparison of the stores, a Walgreens store and a general grocery store are similarly situated with respect to the purpose of the ordinance. There is no reason to believe the implied message conveyed by a Walgreens that sells tobacco products is any different from the implied message conveyed by a supermarket or big box store that sells such items. To survive an equal protection challenge, the rationality of the legislative distinction "must be 'plausible' [citation] and the factual basis for that rationale must be *reasonably* conceivable [citation]." (*Hofsheier, supra,* 37 Cal.4th at p. 1201.) Here, there is no reasonably conceivable factual basis for finding that the purported implied message approving tobacco use is "stronger" at a Walgreens than it is at a supermarket containing a licensed pharmacy.

Walgreens attacks not only the exemption for general grocery stores and big box stores but also claims the very premise of the legislation is questionable. According to Walgreens, "It is simply not credible that 'pharmacies convey tacit approval of the purchase and use of tobacco products' . . . given the decades of anti-smoking media campaigns and warnings that would counteract any such implied message." The premise underlying the prohibition on sales of tobacco products in pharmacies may not be universally accepted. Nonetheless, the government unquestionably has a legitimate interest in discouraging tobacco use. Here, the City made a determination that prohibiting sales of tobacco products in pharmacies furthers that legitimate interest, a determination supported by numerous professional medical and pharmaceutical organizations. While that assessment may be subject to debate—and indeed was debated by members of the Board of Supervisors—it does not violate any constitutional principle.

■ Although it is generally not the court's role to examine the legitimacy of the legislative purpose underlying legislation,[10] we must necessarily consider a law's purpose more carefully when it provides the justification for treating similarly situated persons differently. In other words, a law based upon a questionable premise may violate no constitutional proscription if applied uniformly to all similarly situated persons. But a law that discriminates among similarly situated persons based upon that same questionable or speculative premise may well lack a rational basis to support the unequal treatment. In this case, the City has relied upon a premise that is itself subject to debate to support narrow distinctions the generic premise simply does not support. With the image of a small, traditional independent pharmacy in mind—one that primarily sells pharmaceutical prescriptions, over-the-counter

---

[10] The day is past when the courts "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. [Citations.]" (*Williamson v. Lee Optical Co.* (1955) 348 U.S. 483, 488 [99 L.Ed. 563, 75 S.Ct. 461].)

medications, personal care items, and little more—the justification for precluding customers from obtaining the impression that the licensed pharmacist endorses the use of tobacco products can be readily understood. There is an unmistakable difference, however, between the traditional independent pharmacy selling predominantly pharmaceuticals and contemporary chain stores that sell a far greater variety of merchandise, including foodstuffs as well as prescription drugs. The premise underlying the ordinance—that pharmacies selling tobacco products convey tacit approval of tobacco use—has a questionable application to stores such as Walgreens, and it certainly does not support the narrow distinction in the ordinance between stores such as Walgreens and general grocery stores. As discussed above, the distinction turns largely on whether the store primarily sells food items, a difference that has little bearing on the "strength" of any implied message that may be conveyed by selling tobacco products in a store that contains a licensed pharmacy.

The analysis in *Hays v. Wood* (1979) 25 Cal.3d 772 [160 Cal.Rptr. 102, 603 P.2d 19] is particularly apt. There, our Supreme Court held equal protection was denied by a provision of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.) requiring public officials who are also attorneys or brokers to disclose the names of clients paying them $1,000 or more in fees a year, while officials practicing any other professions were required to disclose only clients paying them $10,000 or more in annual fees. (25 Cal.3d at pp. 778–779.) The court could find no rational basis for creating different financial disclosure levels for "lawyers and brokers on the one hand and, on the other [hand] . . . members of other professions" or others "whose relative profit margin is comparable to theirs." (*Id.* at pp. 789–790.) The Attorney General advanced four conceivable bases for the distinction, each of which was rejected by the court. As relevant here, the Attorney General urged that the "classification here in question finds a rational basis on the ground of strengthening public confidence in the political process." (*Id.* at p. 794.) The argument, as the court understood it, "rest[ed] upon the rather curious assertion that the public, seeing an attorney advocate a position in his role as public official, 'may believe, more so than for persons in other professions,' that he is really promoting the interests of a private client." (*Ibid.*) "[T]o disabuse the public of this pernicious and misguided notion," the court was advised that "more stringent disclosure requirements have been placed upon the attorney." (*Id.* at pp. 794–795.) The court rejected the contention, reasoning that although a concern about the appearance of impropriety

involving public officials may support public disclosure laws *in general*, this concern does not justify "significantly different standards of disclosure for members of different professions." (*Id.* at p. 795.)

Like the distinction among professionals in *Hays v. Wood*, the distinction among pharmacies here rests upon the supposed strength of a perception. That perception may justify the prohibition against sales of tobacco products by pharmacies *in general*, but it does not justify treating stores such as Walgreens differently from general grocery stores and big box stores. The City's claim that the implied message, or perception, is somehow stronger at a Walgreens than it is as a general grocery store or big box store is purely speculative.

■ The City urges that the factual basis for a statutory distinction may not be "subject to courtroom factfinding" and may rest on "rational speculation." (*FCC v. Beach Communications, Inc., supra*, 508 U.S. at p. 315.) While true, the distinction must at least be based on "reasonably conceivable facts." (*Hofsheier, supra*, 37 Cal.4th at p. 1204.) The only explanation the City advances as to why it is plausible to assume that, despite their similarities, stores such as Walgreens are more likely than a supermarket such as Safeway or a big box store such as Costco to convey the tacit message that smoking is not harmful is that a greater percentage of Walgreens's sales revenue is derived from prescription drugs than is true of Safeway or Costco.[11]

But why do these revenue percentages indicate that customers receive a different message concerning the safety of tobacco products sold at a store such as Walgreens than the message received by customers of Safeway or Costco? A customer normally would not be aware of the percentage of pharmacy sales at the different types of stores. The City agrees that the percentage of a store's revenue attributable to pharmacy sales does not *cause* a customer to perceive the various types of stores differently. It claims, however, that the comparison of revenues attributable to pharmacy sales reflects the fact that stores such as Walgreens are *in fact* different from grocery and big box stores. That undoubtedly is true, but it begs the question: why do the different sales percentages indicate that purchasers at the different

---

[11] By Walgreens's estimates, pharmacy sales comprise slightly over half of the sales revenue at its City stores. According to the recitals in the City's ordinance, pharmacy sales at Safeway are estimated to be "7.5% of annual volume" and prescription sales generated "1.5% of total revenue in 2002" at Costco.

establishments receive different messages concerning the safety of tobacco products they sell? The public may more closely identify a Walgreens with a licensed pharmacy than a Safeway with a licensed pharmacy, since most Walgreens contain a pharmacy[12] and that is not true of most grocery stores and likely is not true of what have come to be known as supermarkets or big box stores. But the fact that the public considers it more likely to find a licensed pharmacy in a Walgreens than in a supermarket, or is more likely to purchase prescription drugs at a Walgreens than in a supermarket, does not rationally explain why in those stores that contain a licensed pharmacy, the implied approval of smoking is greater in one than the other.

■ It is true, as the City argues, that courts do not force policymakers to tackle an entire problem at one time. "Past decisions . . . establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative." (*Warden v. State Bar, supra,* 21 Cal.4th at p. 644.) It is also the case, however, that "the legislative body, when it chooses to address a particular area of concern in less than comprehensive fashion by merely 'striking the evil where it is felt most' [citation] may not do so wholly at its whim." (*Hays v. Wood, supra,* 25 Cal.3d at p. 790.) Further, even when a classification is considered an incremental or partial step in addressing a problem, the differentiation must still be based on "some plausible reason, based on reasonably conceivable facts." (*Hofsheier, supra,* 37 Cal.4th at p. 1204.) As explained above, the challenged classification does not satisfy this standard. There is no plausible reason to believe that members of the public place any greater reliance on implicit advice regarding the healthfulness of tobacco products conveyed by counter clerks, the corporate structure, or the product mix of a Walgreens than of a Safeway or Costco. We conclude the strength of the purported implied message conveyed by a pharmacy that sells tobacco products does not justify the ordinance's distinction among general grocery stores, big box stores, and all other stores containing a licensed pharmacy.

Other reasons offered by the City to justify the classification among pharmacies are no more persuasive. According to the City, one could rationally conclude that a ban on sales of tobacco products in stores such as Walgreens and Rite-Aid would serve the purpose of limiting the exposure of sick people to cigarettes. The City reasons that customers of Walgreens and Rite-Aid are more likely to be sick than customers of general grocery stores and big box stores. The contention lacks merit. Sick people who go to a

---

[12] The complaint alleges that two Walgreens stores in the City do not contain a licensed pharmacy.

licensed pharmacy at a Safeway or Costco are just as likely to be exposed to tobacco products as those who went to a Walgreens. Moreover, there is no reason to believe supermarkets and big box stores have fewer sick customers than Walgreens. People who are sick still need to buy food and will be exposed to tobacco products at the supermarket when they do their grocery shopping, regardless of whether they also patronize the store for pharmacy services. Further, even if it were true that a larger percentage of Walgreens's customers are sick, it is likely the case that there will be just as many sick customers at supermarkets and big box stores, which common experience suggests have larger numbers of customers overall. Thus, there is no rational relationship between the distinction among pharmacies in the ordinance and the objective of limiting the exposure of sick people to tobacco products.

 In its trial court briefs and again at oral argument in this court, the City contended the Board of Supervisors could have rationally excluded big box stores and grocery stores from the ordinance for economic reasons. Citing an article from the San Francisco Chronicle, the title of which suggests that supermarkets are an "endangered species" in the City, the City urges it is rational to favor supermarkets over stores such as Walgreens in order to discourage them from leaving the City. This proffered rationale is insufficient to support the differential treatment afforded to grocery stores, big box stores, and all other pharmacies. Among other things, the article on which the City relies postdates the enactment of the ordinance and is not contained in the record on appeal. In any event, the article's contents are not a proper subject of judicial notice and therefore may not be considered by this court on review of a ruling sustaining a demurrer. (See *Zelig v. County of Los Angeles, supra*, 27 Cal.4th at p. 1126 [on review of demurrer court considers only complaint and matters subject to judicial notice]; *Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1191–1192 [35 Cal.Rptr.3d 357] [court may take judicial notice of document's existence but not truth of its contents].) Furthermore, the rationale for favoring supermarkets is questionable, at best. There is nothing in the record to suggest the City has a policy of favoring supermarkets over stores such as Walgreens, and none of the ordinance's findings mention an economic basis for the exemptions afforded to general grocery stores. Moreover, given that big box stores as well as general grocery stores enjoy the exemption from the ban on sales of tobacco products, it seems unlikely the exemption could have been motivated by a desire to encourage supermarkets to remain in the City. In short, the economic rationale for the exemption falls into that category of " ' "fictitious purposes that could not have been within the contemplation of the Legislature . . . ." ' [Citation.]" (*Hofsheier, supra*, 37 Cal.4th at p. 1201; see *Warden v. State Bar, supra*, 21 Cal.4th at p. 649.)

For the reasons set forth above, Walgreens's complaint adequately states causes of action for a violation of the equal protection provisions of the

United States and California Constitutions. The order sustaining the City's demurrers to the first and second causes of action therefore must be reversed. Walgreens goes one step further and asks this court to direct entry of judgment in its favor on the equal protection causes of action. It claims the relevant facts are "largely undisputed" and that this court could decide the matter in its favor as a matter of law. (See, e.g., *Widders v. Furchtenicht* (2008) 167 Cal.App.4th 769, 786 [84 Cal.Rptr.3d 428] [reversing order sustaining demurrer and directing entry of judgment for plaintiff].) We decline to do so. As far as this court is aware, the City has not yet answered the complaint or had the opportunity to assert and litigate any affirmative defenses it may wish to raise. It is therefore premature to enter judgment in favor of Walgreens.[13]

Should Walgreens ultimately prevail on its equal protection causes of action, the court will be required to determine whether the appropriate remedy is to preclude enforcement of the entire ordinance or to invalidate only the exceptions contained in San Francisco Health Code section 1009.93. (See *Hofsheier, supra*, 37 Cal.4th at pp. 1207–1208; *Coalition Advocating Legal Housing Options v. City of Santa Monica* (2001) 88 Cal.App.4th 451, 464 [105 Cal.Rptr.2d 802].) This question should be considered in the first instance in the trial court. We express no opinion at this point concerning the appropriate form of relief.

## III. *Proposition I**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[13] Our disposition should not be interpreted to suggest we have reached our decision solely because we must accept as true the allegations in Walgreens's complaint. We agree with Walgreens that the relevant facts appear to be largely beyond dispute. To the extent disputed facts have been brought to our attention, such as the litigants' competing estimates of proportionate revenue attributable to prescription drug sales at Walgreens and other pharmacies, the differences are legally irrelevant, particularly in light of the principle that a legislative choice is not subject to judicial factfinding. (*FCC v. Beach Communications, Inc., supra*, 508 U.S. at p. 315.)

As a consequence of our decision, the parties do not start with a clean slate upon remand. The principles of law necessary to this court's decision become law of the case and must be adhered to both in the court below and upon any subsequent appeal. (*Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, 213 [84 Cal.Rptr.3d 1].) "[I]t has long been held that sufficiency of the pleadings is an issue subject to foreclosure by law of the case. [Citation.]" (*People v. Shuey* (1975) 13 Cal.3d 835, 843 [120 Cal.Rptr. 83, 533 P.2d 211], abrogated on other grounds as recognized in *People v. Bennett* (1998) 17 Cal.4th 373, 389–390, fn. 5 [70 Cal.Rptr.2d 850, 949 P.2d 947].) This appeal therefore precludes any further litigation in this court or the trial court on whether Walgreens's complaint states valid claims for a violation of the equal protection clauses of the federal and state Constitutions.

*See footnote, *ante*, page 424.

## DISPOSITION

The judgment is reversed insofar as it sustained the demurrers to the first and second causes of action. On remand, the trial court is directed to enter a new order (1) overruling the demurrers to the first and second causes of action alleging equal protection violations, and (2) sustaining without leave to amend the demurrer to the third cause of action alleging a violation of Proposition I. Each party shall bear its own costs on appeal.

Pollak, J., and Jenkins, J., concurred.