Filed 5/8/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KIMCO STAFFING SERVICES, INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> THE STATE OF CALIFORNIA et al., <br><br> Defendants and Respondents. | B257258 <br><br> (Los Angeles County <br> Super. Ct. No. BC510127) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debre Katz Weintraub, Judge. Affirmed.

Glassman, Browning, Saltsman & Jacobs, Anthony Michael Glassman and Rebecca Nell Kaufman; Roxborough Pomerance Nye & Adreani, Nicholas P. Roxborough and Michael Adreani for Plaintiffs and Appellants.

Christopher Jagard, Chief Counsel, Fred Lonsdale and Vinodhini R. Keller, Staff Counsel for Defendants and Respondents.

———————————

Plaintiffs and appellants Kimco Staffing Services, Inc. (Kimco) and KimstaffHR, Inc. (KimstaffHR) (collectively, plaintiffs) appeal a judgment of dismissal following an order sustaining without leave to amend a demurrer by defendants and respondents State of California, by and through the California Department of Industrial Relations (Department) and Christine Baker, in her official capacity as Director of the Department (collectively, the State).

Labor Code section 3701.9 prohibits temporary services employers (TSE's) and leasing employers (LE's) from self-insuring their workers' compensation liability.[1] The essential issue presented on appeal is whether section 3701.9 violates equal protection because it treats TSE's and LE's differently from other employers, who are permitted to self-insure.

We conclude plaintiffs did not and cannot allege the statutory difference in treatment lacks a rational basis. As the trial court found, a rational basis exists for treating TSE's and LE's differently from other employers with respect to self-insurance. TSE's and LE's are in the business of providing employees to other businesses, so TSE's and LE's have an incentive to expand their payrolls. TSE's and LE's can dramatically change the scope of their workers' compensation risk by adding new clients and new employees, but the self-insurance deposit would not be adjusted until the subsequent year. (§ 3701, subd. (c).) The potential for a rapid increase in the number of employees, coupled with the delay in adjusting the amount of the self-insurance security deposit, is a rational basis for excluding TSE's and LE's from the workers' compensation self-insurance program. Therefore, the judgment of dismissal is affirmed.

---

[1] All further statutory references are to the Labor Code, unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The enactment of section 3701.9, giving rise to this litigation.*

This controversy arises out of the adoption of section 3701.9, added in 2012 as part of Senate Bill No. 863 (SB 863) (2011-2012 Reg. Sess.), which significantly reformed the workers' compensation law.

By way of background, California law "establishes a workers' compensation system that provides benefits to an employee who suffers from an injury or illness that arises out of and in the course of employment, irrespective of fault. This system requires all employers to secure payment of benefits by either securing the consent of the Department of Industrial Relations to self-insure or by securing insurance against liability from an insurance company duly authorized by the state." (Sen. Com. on Labor & Industrial Relations, Analysis of SB 863 (2011-2012 Reg. Sess.) as amended Aug. 30, 2012, p. 1; see § 3700 [duty of employer to secure payment of workers' compensation], § 3701 [self-insurance].)

The final Senate Committee bill analysis indicated that the stated purpose of SB 863 was "[t]o reduce frictional costs, speed up medical care for injured workers, and to increase Permanent Disability (PD) indemnity benefits to injured workers." (Sen. Com. on Labor & Industrial Relations, Analysis of SB 863 (2011-2012 Reg. Sess.) as amended Aug. 30, 2012, p. 1.)

Section 3701.9, enacted as part of SB 863, prohibits LE's and TSE's from being self-insured. Section 3701.9 provides: "(a) A certificate of consent to self-insure shall not be issued after January 1, 2013, *to any of the following*: [¶] (1) A professional employer organization. [¶] (2) *A leasing employer*, as defined in Section 606.5 of the Unemployment Insurance Code.[2] [¶] (3) *A temporary services employer*, as defined in

---

**2**     Employee leasing has been described as a "new paradigm, a three-sided labor relationship in which control has been expressly separated from other aspects of employment." (*Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 512, conc. & dis. opn. of Brown, J.) A "labor supplier is in the business of providing workers to consumers temporarily in need of certain services. Th[is] situation represents an

3

Section 606.5 of the Unemployment Insurance Code. [¶] (4) Any employer, regardless of name or form of organization, which the director determines to be *in the business of providing employees to other employers*. [¶] (b) A certificate of consent to self-insure that has been issued to any employer described in subdivision (a) shall be revoked by the director not later than January 1, 2015." (§ 3701.9, added by Stats. 2012, ch. 363, § 16, italics added.)[3] [4]

2. *Pleadings; pertinent allegations.*

Plaintiffs commenced this action on May 30, 2013, and filed the operative second amended complaint for declaratory and injunctive relief nine months later. Plaintiffs allege the following:

Kimco is a TSE. Kimco provides staffing solutions to various industries, including financial, healthcare and technical/engineering. Kimco has an internal staff in

---

entirely new labor relationship in which control of the work is exclusively within the purview of the labor consumer," with other aspects of employment exclusively within the purview of the labor supplier. (*Id.* at p. 514.)

[3] The terms "leasing employer" and "temporary services employer" are defined in Unemployment Insurance Code section 606.5, which states in pertinent part at subdivision (b): "[A] 'temporary services employer' and a 'leasing employer' is an employing unit that contracts with clients or customers to supply workers to perform services for the client or customer and performs all of the following functions: [¶] (1) Negotiates with clients or customers for such matters as time, place, type of work, working conditions, quality, and price of the services. [¶] (2) Determines assignments or reassignments of workers, even though workers retain the right to refuse specific assignments. [¶] (3) Retains the authority to assign or reassign a worker to other clients or customers when a worker is determined unacceptable by a specific client or customer. [¶] (4) Assigns or reassigns the worker to perform services for a client or customer. [¶] (5) Sets the rate of pay of the worker, whether or not through negotiation. [¶] (6) Pays the worker from its own account or accounts. [¶] (7) Retains the right to hire and terminate workers."

[4] Plaintiffs' arguments on appeal are focused on section 3701.9's prohibition on self-insurance by TSE's and LE's.

4

California of 137 employees, an average weekly workforce of more than 4,500 employees, and has filled approximately 300,000 staffing positions in California.

KimstaffHR is an LE. KimstaffHR's corporate office employs 17 individuals in California. In addition, KimstaffHR has more than 2,000 client-based employees who provide services to more than 100 businesses in the state.

Since 2003, Kimco and KimstaffHR have participated in the California workers' compensation self-insurance program.

The operative pleading alleges a violation of equal protection under the Fourteenth Amendment to the United States Constitution (first cause of action) and deprivation of equal protection under the California Constitution (Cal. Const., art. 1, § 7) (second cause of action). The gravamen of the complaint is that section 3701.9, which eliminated the right of TSE's and LE's to self-insure, is invalid because it singles out these employers and prohibits them from participating in California's workers' compensation self-insurance program. In doing so, section 3701.9 "treats similarly situated entities differently and arbitrarily, and irrationally distinguishes between them."

3. *The State's demurrer.*

The State demurred to the second amended complaint, contending that even accepting the allegations as true, the Legislature was within its authority in denying TSE's and LE's, as opposed to worksite employers,[5] the privilege of being self-insured. The State argued plaintiffs failed to allege sufficient facts to show they were similarly situated to worksite employers, and as such, plaintiffs failed to plead the difference in treatment amounts to a denial of equal protection.

The State asserted, moreover, that a rational basis existed for the difference in treatment, in that TSE's and LE's posed a different type of risk than worksite employers. Unlike worksite employers, TSE's and LE's can quickly change the scope of risk

---

[5] The State used the term "worksite employer" to refer to those employers who do not provide workers to other employers, but rather, directly employ their own workforces to carry out their businesses.

dramatically by adding employees and expanding into new industries. An employee staffing company has a financial incentive to increase the number of employees on its payroll because its income and profit grows as its payroll expands. In contrast, a worksite employer does not have the same incentive to expand the number of employees on its payroll because its earnings do not increase with every new hire.

The State explained that the concern addressed by section 3701.9 is that a self-insured staffing company may grow rapidly during a calendar year without a concomitant increase in its workers' compensation self-insurance deposit. Self-insured employers do not pay insurance premiums; instead, they post a security deposit each year. The amount of the deposit is governed by section 3701, subdivision (c), which provides that "the deposit shall be an amount equal to the self-insurer's projected losses, net of specific excess insurance coverage, if any, and inclusive of incurred but not reported (IBNR) liabilities, allocated loss adjustment expense, and unallocated loss adjustment expense, *calculated as of December 31 of each year*. The calculation of projected losses and expenses shall be reflected in a written actuarial report that projects ultimate liabilities of the private self-insured employer at the expected actuarial confidence level, to ensure that all claims and associated costs are recognized." (Italics added.)

Relying on the statutory language quoted above, the State explained that a self-insured employer would not have to increase the security deposit for its increased payroll until the *following* year, unlike a typical employer with workers' compensation insurance, which is required to pay an increased premium on newly hired employees as soon as they are hired. When a self-insured employer's security deposit is insufficient, the obligation for the loss falls on the Self-Insurers' Security Fund (Fund) (§§ 3742, 3743) and other self-insured employers may be charged a pro rata share of the funding necessary to meet the obligations of an insolvent self-insurer (§ 3745).

The State supported its demurrer with a request for judicial notice of a complaint filed in 2011 by the Fund against Mainstay Business Solutions (Mainstay) and other

defendants in the Sacramento Superior Court (the *Mainstay* complaint).[6] In that action, the Fund alleged that Mainstay obtained a certificate of consent to self-insure from the Department, and that Mainstay and another defendant established a "payroll mill" and assumed the role of a " 'paper' employer for payroll and workers' compensation purposes." The scheme enabled the codefendants in that action to avoid their statutory obligation to purchase workers' compensation insurance for their employees. The Fund further alleged that Mainstay now was insolvent, and the Fund had been forced to assume the workers' compensation liabilities of about 700 injured California employees whose employers had contracted with Mainstay "to provide *temporary or leased employees*." (Italics added.)

Based thereon, the State argued a rational basis exists for section 3701.9's differentiating between worksite employers who manage their own workforce and those employers who are only nominal employers providing payroll and other services to worksite employers.

4. *Hearing and trial court's ruling.*

On May 21, 2014, the matter came on for hearing. The trial court articulated its tentative ruling, which became the final ruling of the court, as follows:

"An equal protection challenge may be addressed on demurrer. [¶] . . . [¶] The threshold question is whether plaintiffs have pled facts which indicate that they are similarly situated with respect to the purpose of self-insurance as compared to other employers who are still permitted to self-insure. [¶] In this regard defendants have persuasively argued that professional employer organizations, leasing employers, and temporary service employers are not similarly situated in terms of the quantum of risk they may take on as compared to other employers who are still permitted to self-insure.

---

[6] The *Mainstay* complaint is judicially noticeable as a court record. (Evid. Code, § 452, subd. (d).) "Relevant matters that are properly the subject of judicial notice may be treated as having been pled." (*Ross v. Creel Printing & Publishing Co*. (2002) 100 Cal.App.4th 736, 742 (*Ross*).)

7

"Moreover, even assuming the professional employer organizations, leasing employers, and temporary services employers are similarly situated to other employers who are still permitted to self-insure, there does not appear to be a suspect classification or fundamental interest involved. [¶] As such, plaintiffs have the burden of pleading facts as to why there is no rational relationship to a conceivable legitimate state purpose for the Legislature to draw distinction between professional employer organizations, temporary staffing agencies, and employee leasing organizations on one hand which are precluded from self-insuring under the Labor Code and self-insured employers in the other industries who are still permitted to self-insure . . . .

"Plaintiffs' argument in opposition to demurrer focuses on the reasons which actually motivated the Legislature and whether the Legislature actually considered whether temporary service employers and leasing employers were inherently riskier . . . . [¶] . . . [T]he law is clear that the Legislature is not required to articulate its motive in enacting legislation, and for constitutional purposes it's not relevant whether a conceivable legitimate purpose identified by the court[,] not the Legislature[,] actually motivated the Legislature. [¶] The court speculation as to the Legislature's purpose need not be supported by the evidence or empirical data. The constitutional limitation is that the relationship or link between the classification selected by the Legislature and its goal is not so attenuated so as to render the classification arbitrary, or irrational. . . .

"[A] reasonable conceivable factual basis for the classification utilized by the Legislature is that professional employer organizations, leasing employers, and temporary service employers have the ability to greatly increase the number of employees for whom they are responsible to provide workers' compensation insurance coverage in a relatively short period of time . . . . [¶] . . . [¶] On the other hand, the other types of employers generally hire employees on an individual . . . basis to fill foreseeable needs within the company at a less than exponential rate.

"It is also reasonably conceivable that professional employer organizations, leasing employers, and temporary service employers could add clients in new industries

8

and [incur] higher risks of physical injury on the job.  This will then compound the possible . . . increase in risk.  [¶]  It's not relevant for purposes of an equal protection analysis whether the Legislature was actually motivated by this risk, and thus there's no need for the defendant to produce evidence or empirical data to demonstrate that such risk exists.  [¶]  Plaintiffs' argument that no such exponential increase in risk has historically existed with temporary service employers and leasing employers with respect to self-insured workers' compensation liability does not change the analysis.  [¶]  What happened in the past does not necessarily preclude changes in industry practice which may affect future risk.  The Legislature could reasonably conclude that the method of determining the security deposit once a year pursuant to Labor Code section 3701(c) based on the self-insured's projected losses and  liabilities for the past year calculated December 31st is generally inadequate to account for such potential exponential increases in risk, notwithstanding the ability to audit and adjust security deposits.  [¶] . . . [¶]  While plaintiffs note that financial disaster may befall temporary service employers and leasing employers as a result [of] denying them the ability to self-insure their workers' compensation liabilities, this result cannot affect the equal protection analysis.  [¶] . . . '[T]he inquiry of equal protection does not focus on abstract fairness of a state law, but rather [whether] the statute's relation to the state's interest that it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment.' "

The trial court concluded the second amended complaint failed to plead facts sufficient to constitute a violation of equal protection under either the federal or California Constitutions and sustained the demurrer to both causes of action without leave to amend.

Plaintiffs filed a timely notice of appeal from the judgment of dismissal.

Plaintiffs contend: TSE's and LE's are similarly situated to other employers who are allowed to self-insure, and section 3701.9 lacks a rational basis for excluding TSE's and LE's from the self-insurance program.

**DISCUSSION**

1. *Standard of appellate review.*

Our review of the trial court's ruling is governed by well-settled principles. " '[O]ur standard of review is de novo, "i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." [Citation.]' [Citation.] ' " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.]" ' [Citation.] 'We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citations.] We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale. [Citation.]' [Citation.]" (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433 (*Walgreen*).)

2. *General principles.*

We begin with the premise that a "statute, once duly enacted, 'is presumed to be constitutional. Unconstitutionality must be clearly shown, and doubts will be resolved in favor of its validity.' " (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1086.)

The Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The California Constitution likewise prohibits the denial of equal protection. (Cal. Const., art. I, § 7, subd. (a).)[7]

---

[7] In addressing plaintiffs' state equal protection claim, we also consider decisions of the United States Supreme Court because equal protection under the California

10

When a statute is challenged on equal protection grounds, a court's initial inquiry is twofold.  It first must determine whether " 'the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.'  [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' "  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

If a challenged statute "affects similarly situated groups unequally, the court must then decide whether to apply the strict scrutiny or rational basis test in analyzing the statute's constitutionality."  (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1324.)  Because section 3701.9 does not involve a suspect classification or interfere with the exercise of a fundamental right (*Walgreen*, *supra*, 185 Cal.App.4th at p. 435), the parties properly agree the deferential rational basis test governs our consideration of plaintiffs' equal protection claim.

Rational basis review " ' "is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a 'discrimination' or differentiation of treatment between classes or individuals.  It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and 'requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose.'  [Citation.]" ' "  (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641.)

A legislative "choice is not subject to courtroom factfinding *and may be based on rational speculation unsupported by evidence or empirical data*.  [Citations.]"  (*FCC v. Beach Communications, Inc*. (1993) 508 U.S. 307, 315 [124 L.Ed.2d 211], italics added (*FCC*); accord *Heller v. Doe* (1993) 509 U.S. 312, 320 [125 L.Ed.2d 257] [statutory

_____

Constitution is " 'substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution.' "  (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571.)

11

classification may be based on rational speculation unsupported by evidence or empirical data]; *Jensen v. Franchise Tax Bd.* (2009) 178 Cal.App.4th 426, 436 [same]; *Walgreen*, *supra*, 185 Cal.App.4th at p. 435 [same].) The Legislature is not "require[d] . . . to articulate its reasons for enacting a statute, [making] it . . . entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the [L]egislature." (*FCC*, *supra*, 508 U.S. at p. 315.) The burden of demonstrating the invalidity of a legislative classification under the rational basis standard rests squarely upon the party who assails it (*Warden*, *supra*, 21 Cal.4th at p. 641), who must negate every "reasonably conceivable state of facts that could provide a rational basis for the classification." (*FCC*, *supra*, 508 U.S. at p. 313.)

       3. *The similarly situated prong*.

       As indicated, the trial court ruled that the State persuasively had argued on demurrer that TSE's and LE's "are not similarly situated in terms of the quantum of risk they may take on as compared to other employers who are still permitted to self-insure," but "even assuming" TSE's and LE's are similarly situated to other employers who are still permitted to self-insure, a rational basis exists for the difference in treatment.

       We need not resolve whether TSE's and LE's are similarly situated to other employers for purposes of section 3701.9. Because we conclude, below, that section 3701.9's classification is supported by a rational basis, it is unnecessary to address whether TSE's and LE's are similarly situated to other employers. We will assume, without deciding, that TSE's and LE's are similarly situated to other employers. (See, e.g., *In re Spencer S.*, *supra*, 176 Cal.App.4th at p. 1325 [court assumed, without deciding, that juvenile felons and juvenile misdemeanants are similarly situated for purposes of a challenged statutory classification].)

       4. *Section 3701.9 withstands rational basis scrutiny*.

       TSE's and LE's are in the business of providing employees to other businesses. Kimco alleges it has an internal workforce of 137 employees, but its overall workforce is far larger; its average weekly workforce exceeds 4,500 employees, making its ratio of

client-based employees to internal employees nearly 33 to one. During 2012 alone, Kimco filled 22,614 job openings. Similarly, KimstaffHR has only 17 corporate employees but employs more than 2,000 others, making its ratio of client-based employees to internal employees 117 to one.

Unlike traditional or worksite employers, which only hire employees consistent with their business needs, TSE's and LE's are in the business of providing employees to other businesses. TSE's and LE's admittedly have an "incentive to add new clients" and to expand their payrolls. Therefore, as the trial court observed, TSE's and LE's can change the scope of their workers' compensation risk dramatically during the course of a year, by taking on new clients and adding employees to their payroll. While a TSE's or LE's payroll may grow rapidly during a calendar year, the company's self-insurance deposit would not be adjusted until the subsequent year. (§ 3701, subd. (c).) The potential for a rapid increase in the number of employees, coupled with the delay in adjusting the amount of the self-insurance security deposit, is a rational basis for excluding TSE's and LE's from the workers' compensation self-insurance program. (§ 3701.9.)

Plaintiffs assert that in the event a TSE's/LE's scope of risk changes before it files its mandatory annual report, for good cause it may be required to post and maintain an additional security deposit. (§ 3702.6 [audit program]; 8 Cal. Code Regs. § 15210.1 [adjustments in amount of security deposit].) The argument is unpersuasive. It is fanciful to suggest the Department has the ability to monitor TSE's/LE's on an ongoing basis to determine whether the scope of the risk has changed between reporting periods.

The *Mainstay* complaint, which was filed in 2011, and which was submitted to the trial court by way of the State's request for judicial notice, provides further support for the Legislature's decision in 2012 to address self-insurance of employers who are "in the business of providing employees to other employers" (§ 3701.9, subd. (a)(4)), in the context of SB 863. We take judicial notice "only as to the existence of the complaint, not as to the truth of any of the allegations contained in it." (*Ross*, *supra*, 100 Cal.App.4th at

13

p. 743.)  That being said, because the rational basis test applies, it is irrelevant for constitutional purposes whether the *Mainstay* litigation actually motivated the Legislature.  (*FCC*, *supra*, 508 U.S. at p. 315.)  That litigation simply illustrates the complications that could arise if a self-insured TSE or LE becomes insolvent and the Fund is required to assume the workers' compensation liability of the defunct employer's temporary or leased employees.

As the trial court found, the Legislature reasonably could conclude that the annual method of determining the self-insured security deposit based on the self-insured's projected losses and liabilities calculated as of December 31 of each year (§ 3701, subd. (c)) is inadequate to account for a potential exponential increase in risk during a calendar year, notwithstanding the Department's ability to audit and adjust security deposits.  Thus, a rational basis exists for treating TSE's and LE's differently from other employers with respect to self-insurance.

In sum, plaintiffs did not and cannot allege a violation of equal protection.[8]

---

[8]    Plaintiffs make the unsupported assertion that section 3701.9's ban on self-insurance "was a last minute addition [to SB 863] by labor unions . . . because of their disdain for TSEs/LEs."  The argument the statute is infirm because it was motivated by animus is meritless.  "Of course, statutory classifications do not serve legitimate state interests when adopted for their own sake, out of animus toward a disfavored group. [Citations.]" (*In re Marriage Cases* (2008) 43 Cal.4th 757, 873-874, conc. and dis. opn. of Baxter, J.)  If "the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." (*U.S. Department of Agriculture v. Moreno* (1973) 413 U.S. 528, 534 [37 L.Ed.2d 782]; accord, *Romer v. Evans* (1996) 517 U.S. 620, 634 [134 L.Ed.2d 855].)  Here, however, it cannot credibly be maintained that TSE's and LE's are a disfavored group for purposes of equal protection analysis.  Therefore, plaintiffs' theory that section 3701.9 was motivated by impermissible animus must fail.

14

**DISPOSITION**

The judgment of dismissal is affirmed.  Respondents shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**


EDMON, P. J.


We concur:


KITCHING, J.


ALDRICH, J.