[No. E052369. Fourth Dist., Div. Two. Feb. 28, 2012.]

REALPRO, INC., Plaintiff and Appellant, v.
SMITH RESIDUAL COMPANY, LLC, et al., Defendants and Respondents.

**COUNSEL**

Lieberg Oberhansley Strohmeyer & Garn, Jon H. Lieberg and William H. Strohmeyer for Plaintiff and Appellant.

Reid & Hellyer, James J. Manning, Jr., Steven G. Lee and Jenna L. Acuff for Defendants and Respondents.

**OPINION**

**HOLLENHORST, J.**—Plaintiff and appellant RealPro, Inc. (RealPro), appeals from a judgment in favor of defendants Smith Residual Company, LLC,

and J&A Gonzales, LLC (hereafter referred to collectively as Sellers), entered after the trial court sustained without leave to amend the demurrer of Sellers to RealPro's complaint to recover a real estate commission. The trial court found that RealPro "failed to allege facts giving rise to the existence of an enforceable written contract for the payment of a real estate commission . . . ." RealPro challenges the trial court's ruling.

## I.  PROCEDURAL BACKGROUND

A demurrer admits all the truth of all material facts properly pleaded. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) Accordingly, we will refer to the allegations in the complaint for the chronology of this matter. (See *Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 954, fn. 4 [102 Cal.Rptr.3d 343].)

RealPro is a real estate broker conducting business under the fictitious business name of Landpro Network Realty. Sellers own 46.8 acres of vacant land in Riverside County (the Property). On or about September 21, 2005, Sellers retained the services of MGR Services, Inc. (MGR), a real estate broker, to act as their exclusive agent for the sale of the Property. Sellers entered into a "Standard Owner-Agency Agreement for Sale or Lease of Real Property" (the Listing Agreement) with MGR. The Listing Agreement was for a term from September 21, 2005, to April 1, 2006. It set forth the following sale price and terms: "$17,000,000.00 cash or for such other price and terms acceptable to [Sellers], and other additional standard terms reasonably similar to those contained in the 'STANDARD OFFER, AGREEMENT AND ESCROW INSTRUCTIONS FOR THE PURCHASE OF REAL ESTATE,' published by the AIR Commercial Real Estate Association ('AIR') or for such other price and terms agreeable to [Sellers]." The Listing Agreement authorized MGR to list the Property in the appropriate local commercial multiple listing services, including AIR, and " 'at [MGR's] election, cooperate with other real estate brokers (collectively "Cooperative Broker"). A Cooperative Broker may, as a third party beneficiary hereof, enforce the terms of this [Listing] Agreement against the [Sellers] or [MGR].' "

On or about November 21, 2005, RealPro contacted MGR regarding the Property. The next day, RealPro delivered to MGR a written offer to purchase the Property for all cash at the full listing price of $17 million (Offer). The buyer was "ready, willing, and able to purchase the Property . . . on all material terms contained in the Loopnet listing as represented by MGR to be in the Listing Agreement . . . ."

On December 22, 2005, RealPro received an acknowledgement from MGR that it had received the Offer and indicated that the listing price was being

increased to $19.5 million (Counteroffer). Except for the increased price, Sellers indicated that the terms of the buyer's offer to purchase were acceptable. Both MGR and Sellers confirmed in writing the brokerage fee of 4 percent split 50/50 between RealPro and MGR. On March 16, 2006, RealPro, as third party beneficiary of the Listing Agreement, demanded its 2 percent brokerage fee, along with copies of the Listing Agreement and amendments.

When Sellers refused to pay the brokerage fee to RealPro, it filed a complaint on November 20, 2009, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Although a copy of the Listing Agreement was attached to the complaint, RealPro failed to attach a copy of the Offer or Counteroffer. Sellers demurred to the complaint, and RealPro filed a first amended complaint (FAC), which alleged (1) declaratory relief, (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing. Again, RealPro failed to attach a copy of the Offer or Counteroffer.

Sellers demurred to the FAC on the grounds that (1) declaratory relief "operates *prospectively*, and not for the redress of past wrongs"; (2) RealPro failed to provide the Offer and Counteroffer, which contradict the allegations in the FAC;[1] (3) conditions precedent (i.e., the listing price is " '$17,000,000 cash *or for such other price and terms acceptable to the owner*' " and that escrow must close prior to payment of any commission) were not met; and (4) there was no written agreement between MGR and RealPro.

In opposition, RealPro argued that (1) the Offer and Counteroffer are "extraneous documents" that may not be considered by the court; (2) no contract between MGR and RealPro was necessary because RealPro was the third party beneficiary of the Listing Agreement; (3) use of the word "or" means that RealPro could either procure an offer for $17 million or an offer for such other terms as the Sellers found acceptable; and (4) there was no requirement for escrow to close in order for RealPro to earn its commission.

Hearing on the demurrer was held on July 14, 2010. Following argument from counsel, the court took the matter under submission. On August 4, the court entered its order sustaining the demurrer without leave to amend. The court found that RealPro had "failed to allege facts giving rise to the existence of an enforceable written contract for the payment of a real estate commission . . . ." Judgment was entered on September 30, 2010, and this appeal followed.

---

[1] Attached to Sellers' demurrer are copies of the Offer and Counteroffer.

## II.  STANDARD OF REVIEW

" 'On review of an order sustaining a demurrer without leave to amend, our standard of review is de novo, "i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." [Citation.]' [Citation.] ' " "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.]" ' [Citation.] 'We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citations.] We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale. [Citation.]' [Citation.]" (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433 [110 Cal.Rptr.3d 498].)

## III.  DISCUSSION

In sustaining the demurrer without leave to amend, the trial court focused on specific language in the Listing Agreement, which defined the nature of the transaction concerning the Property for which MGR was employed, namely, "A sale for the following sale price and terms[:] *$17,000,000.00 cash or for such other price and terms acceptable to [Sellers]*." (Italics added.) In finding that RealPro had not earned a commission upon presenting an offer of $17 million cash, the court stated: "This listing isn't just bringing an offer with numbers . . . ."

In response, RealPro argued that the court was "ignoring plain English of what 'or' means," and argued that if an agent brings in an offer of "17 million cash" then a commission is due. The court replied: "Let's say we were still in the very good market . . . and there was a listing agreement of 17 million or other terms, and there were bidding wars. So you're telling me that the listing agent, if they brought in a full price offer and then it bid up from there, everybody would be entitled to a commission?" RealPro answered the question in the negative, stating that the first broker to procure "a full price offer on the terms and conditions, 17 million cash," from a ready, willing and able buyer, is the broker entitled to the commission. It argued that whether or not Sellers countered the offer, RealPro was entitled to be paid its commission. Sellers argued that the $17 million price was the listing price, not the "full price." Agreeing with Sellers, the trial court found that the complaint could not state a claim for a commission earned.

On appeal, we conclude that the trial court correctly sustained Sellers' demurrer without leave to amend, because the FAC's allegations and relevant agreements establish as a matter of law that there was no enforceable written contract entitling RealPro to a commission.

Regardless of all the arguments raised by both parties, the outcome of this appeal is solely dependent upon the interpretation of the language in the Listing Agreement. Thus, we begin with an analysis of the conditions upon which RealPro was entitled to earn a commission. RealPro claims that by procuring a "ready, willing and able" buyer to purchase the Property for the list price of $17 million, it had earned its commission. As Sellers point out, RealPro "sees the $17 million in cash as the only term upon which a commission depended." However, such was not the case.

When Sellers contracted with MGR to list their Property, they entered into the Listing Agreement, which sets forth the terms upon which MGR, or a cooperating broker, would earn a commission. According to the Listing Agreement, the Property was listed for $17 million cash or for such other price and terms acceptable to Sellers. A commission was earned when "a buyer is procured who is ready, willing and able to buy the Property at the price and on the terms stated herein, or on any other price and terms agreeable to [Sellers]." Contrary to RealPro's interpretation, $17 million cash was not the only term upon which a commission depended.

The confusion centers on the use of the word "or" in the Listing Agreement at paragraph 1.4(a). RealPro interprets the word "or" as separating $17 million from "such other price and terms acceptable to [Sellers]." However, we interpret it to include "such other price." Thus, the listing was for $17 million or such other price, plus terms acceptable to Sellers. Accordingly, the presentation of a $17 million cash offer did not obligate the Sellers to enter into a purchase and sale agreement; rather, it was merely an offer to purchase the Property for $17 million plus terms acceptable to Sellers.

As Sellers point out, several conditions precedent exist for the payment of a commission. Besides the above condition, i.e., "terms acceptable to [Sellers]," paragraph 5.1(a) of the Listing Agreement states that beyond "the price and on the terms stated herein," other prices and terms may be agreeable to Sellers. Thus, Sellers are allowed "to specify a price and terms, even outside of the four corners of the document, that must be met by a purchaser." Moreover, paragraph 5.2(b) of the Listing Agreement authorizes payment of commissions at close of escrow.

Notably absent from the Listing Agreement is language that allows for payment of any commissions simply upon the receipt of a full price offer. However, RealPro would have this court find that such was the case. As Sellers point out, doing so would have the following results: "1) A seller would not have the option to accept a higher offer on acceptable terms without still owing a commission to a broker who presented a concurrent unacceptable offer; [¶] 2) A seller would be responsible to pay multiple

commissions on all submitted full price offers, irrespective of the offers' terms; [¶] 3) A seller would be responsible to pay a broker's commission if the purchaser breached before the sale was consummated simply because the broker had procured a buyer willing to purchase the property for the listing price; [¶] 4) Prospective buyer's brokers would have no incentive to obtain purchase prices below the listing price because it would jeopardize the broker's right to a commission." If we follow RealPro's interpretation of the Listing Agreement, we would have to conclude that these results represent the expectations of someone wanting to sell real property. This we cannot do.

█ " 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" ' [Citation.]" (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385].) "Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

█ Given the record before this court, we, like the trial court, conclude that the $17 million price was merely an invitation to submit offers. (*Palmtag v. Danielson* (1947) 30 Cal.2d 517, 521 [183 P.2d 265] ["Ordinarily, the price at which a broker is authorized to sell property is considered merely an asking price to guide the broker in his negotiations with prospective purchasers. [Citation.]"].) And, that is what RealPro did on November 22, 2005, i.e., submit an offer.[2] Although RealPro stated that it was submitting "an all cash Purchase and Sale Agreement," paragraph 11 of the offer acknowledges that it was merely an offer that would "remain in full force until 5 p.m. on November 25, 2005." Sellers replied with the Counteroffer that was not accepted.

█ For the above reasons, we conclude the trial court properly sustained Sellers' demurrer without leave to amend. Although RealPro submitted an

---

[2] Although the trial court did not find it necessary to take judicial notice of any documents other than the Listing Agreement, and RealPro faults Sellers for referencing those documents (Offer and Counteroffer), "on review of a demurrer, in addition to the allegations of the complaint, we may consider other relevant matters of which the trial court could have taken judicial notice and we may treat such matters as having been pleaded. [Citations.]" (*Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 538 [260 Cal.Rptr. 713].)

offer to purchase the Property, such offer never materialized into a sale that would trigger RealPro's right to a commission. Thus, the trial court correctly interpreted the language in the Listing Agreement and found that merely presenting an all cash offer for $17 million did not obligate Sellers to pay a commission.

## IV.  DISPOSITION

The judgment is affirmed. Sellers shall recover their costs on appeal.

Ramirez, P. J., and McKinster, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 2012, S201497.