Filed 12/13/23  P. v. Foreman CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TREVON LEE FOREMAN, <br><br> Defendant and Appellant. | F084001 <br><br> (Super. Ct. No. BF171558A) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Robert K. Gezi, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Trevon Lee Foreman (appellant) fired five shots from a vehicle at a group of people gathered in front of a house in rival gang territory, killing one person and injuring two others.

A jury convicted appellant of first degree murder (Pen. Code, § 187, subd. (a); count 1),[1] two counts of willful, premeditated, and deliberate attempted murder (§§ 664, 187, subd. (a); counts 2 and 3), shooting at an inhabited residence (§ 246; count 4), shooting from a motor vehicle at another person (§ 26100, subd. (c); count 5), and being a felon in possession of a firearm (§ 29800, subd. (a); count 6). As to count 1, the jury found true special circumstances allegations for discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)) and killing while an active participant in a criminal street gang to further the activities of the gang (§ 190.2, subd. (a)(22)). As to counts 1 through 5, the jury found true enhancements for intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

Following trial, the trial court found appellant suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and a prior serious felony conviction (§ 667, subd. (a)). The court sentenced appellant to life in prison without the possibility of parole (LWOP), plus an indeterminate term of 103 years to life, plus 15 years.

Appellant was tried jointly with his codefendant, Anthony Gage, who the prosecution alleged was present in the car with appellant during the shooting. Gage was charged with most of the same offenses as appellant but was acquitted by the jury.

Appellant raises numerous claims on appeal. He contends the trial court erred in failing to bifurcate the gang-murder special-circumstances allegation, the evidence at trial was insufficient to support the special circumstances finding, rap videos admitted at trial should have been excluded under recently enacted Evidence Code section 352.2 and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

violated the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (CRJA), the evidence was insufficient to corroborate accomplice testimony, and that his sentence to LWOP violates equal protection. We conclude no error occurred, and that any presumed error was harmless. We affirm.

**BACKGROUND**

**The Shooting on East 10th Street.**

On the afternoon of March 9, 2018, a group of people gathered in front of a house on East 10th Street in Bakersfield for the wake of a person in the neighborhood who had died recently. March 9 was also "hood day" for the East Side Crips (ESC) gang, and the house on East 10th Street was within ESC gang territory. On a "hood day," members of a gang will come out in public in their colors, celebrate the gang, party, and pay tribute to deceased or incarcerated members.

Around 4:30 p.m., a blue Taurus traveled westbound on East 10th Street past the house where the gathering was occurring. The Taurus continued to the end of the block, made a U-turn, and travelled back toward the house. When the car returned, a witness heard someone inside the Taurus say: "Fuck you all." The front passenger leaned out of the window and fired five shots at the group in front of the house. The Taurus then sped away.

The shots fired from the Taurus struck three people in front of the house. Edward King, a member of the ESC gang, was shot in the left side of the chest. Jontrai McGill was shot in the lower left leg. Ruben Garcia was shot in the back, and later died from his injuries.

**Preliminary Investigation.**

ShotSpotter, an automated gunshot detection system, detected five gunshots fired in rapid succession in front of the East 10th Street house. Law enforcement personnel located five expended .22-caliber cartridge casings in the street in front of the house. A

firearms expert examined the cartridge casings and concluded they were all fired by the same firearm.

Eyewitnesses to the shooting provided law enforcement with varying descriptions of the suspects. One witness described the driver as a Hispanic female with one or two additional passengers in the car. Another witness stated the driver was a Black male, the shooter looked like a female because of the person's slim build, and that there were two Black male passengers in the back of the car. A third witness stated the driver was a female, and the shooter was a light skinned Black male.

Officers collected surveillance video from a residence two houses down from the shooting. The surveillance video shows a blue Taurus traveling westbound on East 10th Street past the house where the shooting occurred. Approximately two minutes later, the Taurus returned eastbound on East 10th Street. As the Taurus passed the house, the shooter extended his arm and upper body out of the front passenger window, holding a dark object in his right hand consistent with a firearm. The video is not of sufficient quality to identify the shooter, but showed the car was occupied by a driver, the shooter, and a rear passenger. It also showed that the Taurus had distinctive body damage, including paint transfer on the front driver side bumper and a large dent on the rear passenger door.

Officers also obtained surveillance video from a convenience store showing the same Taurus traveling northbound on Dr. Martin Luther King Jr. Boulevard toward the residence on East 10th Street minutes before the shooting.

**Officers Locate the Taurus and Interview the Driver, Marlisha Oliver.**

The day after the shooting, officers located the Taurus and conducted an enforcement stop. Marlisha Oliver was driving. She was the registered owner of the Taurus. Three of her younger siblings were also in the car.

4.

Oliver was transported to the police station where she was interviewed by detectives. The recording of her interview was admitted into evidence and played for the jury.

During the interview, Oliver initially denied involvement in the shooting, claiming she was with her cousin at a market when the shooting occurred. Detectives recovered surveillance video from that market and informed Oliver it showed she was not there. They also confronted her with the surveillance video from East 10th Street showing her car was used in the shooting.

Oliver then admitted she was the driver, but claimed she did not know the shooting was going to occur. She stated that on the afternoon of the shooting she went to a child's birthday party on Reese Avenue. At the party, a woman named Kenzie Richmond gave her $20 for gas and asked her to follow appellant and Gage and give them a ride after they drop off their car somewhere. She agreed and followed them in her car. Appellant and Gage parked their car at a house, then got into her car.

Oliver stated appellant and Gage told her to take them to the "Eastside" to drop them off. They directed her to drive down various streets until they reached East 10th Street. After they drove past the house where the shooting occurred, Oliver asked them where they wanted to be dropped off. Appellant told Oliver he wanted to "see somethin' real fast," and instructed her to make a U-turn. As she drove back by the house on East 10th Street, she saw a group of people standing in front. She noted there were a lot of people outside because it was "Eastside's Hood Day."

Oliver stated appellant told her not to drive too fast. Oliver looked in her rearview mirror and saw Gage, who was sitting in the back seat, pull out a firearm. Appellant, who was sitting in the front passenger seat, also pulled out a firearm. Appellant then leaned out of the open passenger window, putting his entire upper body out of the car, and fired four or five shots. As Oliver sped away, appellant put his firearm back in his pocket; Gage had already put his firearm away. Oliver was upset and yelled and cursed

5.

at appellant and Gage. She drove them back to the party on Reese Avenue and lost track of where they went.

At trial, Oliver testified with a grant of use immunity. Her testimony was generally consistent with her interview, except she testified she never saw Gage with a firearm. She was shown the surveillance video of the shooting and identified herself and her Taurus.

**Other Witnesses Confirm that Oliver, Appellant, and Gage Were at the Party on Reese Avenue Prior to the Shooting.**

In a statement to law enforcement, Kenzie Richmond stated that Oliver, appellant, Gage, and Gage's girlfriend were at the party on Reese Avenue. She claimed she did not introduce Oliver to any males at the party because "[e]verybody mostly know everybody," and denied giving Oliver $20 for gas money.

Gage's girlfriend testified she was at the party on Reese Avenue with Gage, and that she saw Oliver there. She claimed she never saw Gage leave the party.

**Gage's Fingerprint Was Found Inside the Taurus. DNA Evidence from the Taurus Was Inconclusive.**

Oliver's Taurus was processed for evidence. A fingerprint lifted from the rear driver side window matched Gage's middle finger. No fingerprints matching appellant were located.

DNA swabs from the center console and front passenger exterior door handle included several contributors but were inconclusive as to appellant.

**Officers Observe a Subject Retrieve a .22-Caliber Firearm from Bushes Near Appellant's Parents' Residence.**

Two days after the shooting, a team of officers in plain clothes searched for appellant near his parents' residence. While conducting surveillance, an officer saw a subject walking near the residence reach into some bushes and retrieve a pistol. The officer, who had extensive knowledge of firearms, described the pistol as a Ruger-style .22-caliber pistol. The subject put the firearm into his waistband and walked away.

6.

A second officer began pursuing the subject, but lost sight of him when he went into an apartment complex. The second officer only saw the subject's face briefly, but based on his review of a recent photograph, believed the subject was "likely" appellant.

**Appellant Is Arrested After a Standoff with Police.**

In July 2018, officers located appellant at a house and sent a team of officers to apprehend him. The officers surrounded the house and made "surrender call outs" over a loudspeaker. Five subjects immediately exited, but appellant remained inside. Appellant's Snapchat records showed he sent out messages stating: "The boys got me. They got the house surrounded," and "Y'all N words don't forget about me." After approximately two hours of repeated call outs, appellant finally exited the house and was placed under arrest.

**Expended Cartridge Casings Found in Another Vehicle Connect Appellant to the Firearm Used in the Shooting.**

In October 2017, officers located a Grand Cherokee in Bakersfield that matched a description they had been given earlier that day. The Grand Cherokee had been reported stolen, and the engine block was still warm, indicating the vehicle had been recently used. Law enforcement personnel recovered two .22-caliber expended cartridge casings from the car. One of the two casings was on the front driver side floorboard, and the other was on the front passenger side floorboard. A firearms expert examined the casings and concluded they were both fired by the same firearm as the five casings located at the scene of the shooting on East 10th Street.

The Grand Cherokee was also swabbed for DNA evidence. Appellant's DNA was located on the interior front passenger side door and on the steering wheel.

**Gang Evidence**

> *Appellant, Gage, and Oliver Were Active Members of the Country Boy Crips. King, One of the Victims of the Shooting, Was an Active Member of a Rival Gang.*

At trial, the People's gang expert opined that appellant, Gage, and Oliver were active Country Boy Crips (CBC) gang members on the day of the shooting. Appellant had several gang tattoos, numerous photos and messages on his social media profiles showing allegiance to the CBC gang, and admitted he was a CBC gang member during a prior traffic stop. Gage also had a gang tattoo, gang references on his social media profiles, and law enforcement located gang paraphernalia in his residence during the execution of a search warrant.

At trial, Oliver testified that she became a CBC gang member in 2016. During a traffic stop in 2015, she stated that she was a CBC gang member, that she fought female members of rival gangs, and that she would go into rival gang territory to gain information.

The gang expert also opined that King was an active ESC gang member on the day of the shooting, based on his social media posts, tattoos, and law enforcement contacts.

> *Predicate Offenses.*

The People's gang expert opined that the CBC gang has engaged in an ongoing pattern of criminal activity based on evidence of the following predicate offenses.

In March 2016, while officers were conducting a traffic stop on a vehicle occupied by appellant and another CBC gang member, appellant discarded a firearm out of the front passenger window. Appellant was convicted of carrying a loaded firearm while an active participant in a criminal street gang. (§ 25850, subd. (c)(3).) The gang expert opined the offense collectively benefited the CBC gang because the stop occurred in an area where multiple gangs operate, and therefore the firearm was needed for offensive and defensive purposes. Appellant's effort to discard the firearm also benefitted the gang

8.

because if appellant was able to avoid arrest, he would be able to remain in public and commit additional offenses for the gang.

In September 2016, officers conducted a traffic stop on a vehicle occupied by two CBC gang members and located a firearm beneath the driver's seat. One of the CBC gang members was convicted of being a felon in possession of a firearm. (§ 29800, subd. (a).) The People's gang expert opined that firearm possession is critical to the gang, particularly given the ongoing conflicts between the CBC gang and rival gangs. As such, the firearm is needed for protection and to carry out crimes against other gang members.

In March 2013, an officer conducted a traffic stop on a vehicle occupied by a known CBC gang member and another subject. The stop occurred in the territory of a rival gang. Both occupants attempted to flee but were arrested after a brief foot pursuit. Officers located a firearm in the path of the CBC gang member's flight. The CBC gang member was convicted of being a felon in possession of a firearm (§ 29800, subd. (a)), active participation in a criminal street gang (§ 186.22, subd. (a)), and other related offenses. The gang expert opined that the offense collectively benefitted the gang because it "wouldn't be wise" to travel through rival gang territory without a firearm.

In April 2017, an officer watched a rap video on YouTube titled "OBL" that included several known CBC gang members, including appellant. In the video, one of the CBC gang members can be seen carrying a firearm in his waistband. The officer subsequently executed a search warrant on that CBC gang member's residence and recovered a firearm that appeared to be the same firearm shown in the music video. The CBC gang member was convicted of felon in possession of a firearm (§ 29800, subd. (a)(1)) with a gang enhancement (§ 186.22, subd. (b)(1)). The People's gang expert opined the offense collectively benefitted the gang because the firearm could be

9.

used for offensive and defensive purposes, especially while in a large gathering, such as what was shown in the music video.[2]

### *The Shooting Was Gang Motivated.*

The People's evidence established a gang-related motive for the shooting. The People's gang expert explained that the CBC gang and the ESC gang are "mortal enemies," with a history of homicides between the two gangs. All CBC gang members are expected to attack any ESC gang member that they see, or face punishment from their own gang.

The shooting occurred in ESC gang territory on their "hood day." According to the gang expert, gang members often commit shootings on a rival gang's "hood day" to "sabotage the party."

The People also presented evidence that approximately 10 months before the shooting, appellant sent King a message on Facebook stating, "Wattss." The gang expert explained the message refers to Watts Drive, a street within CBC gang territory, and that appellant included two of the letter "s" to signify "South Side," which also relates to the CBC gang. The gang expert explained the message was appellant "bang[ing] on" King or "hitting him up," a form of expressing dominance.

Based on a hypothetical question mirroring the facts of the shooting, the gang expert opined that the shooting furthered the activities of the CBC gang. He explained that the shooting was an attempt to eliminate a rival gang member, and to put the rest of the ESC gang on notice that CBC gang members are willing to come into their territory and shoot them. This makes the ESC gang look weak in the ongoing war between the

---

[2] The People also introduced evidence that Gage and two other CBC gang members committed a burglary and took multiple firearms, and that Gage pled guilty to first degree burglary. (§§ 459, 460.) The trial court admonished the jury at the request of the prosecutor that it could only consider the evidence of the burglary as it "applies to Mr. Gage and not [appellant]."

two gangs.  It also shows the community, as a whole, that the CBC gang is extremely violent and will shoot into crowds to eliminate their targets.

## DISCUSSION

**I.    Section 1109 Does Not Require the Bifurcation of Gang-murder Special-circumstance Allegations.  Any Presumed Error Was Harmless.**

Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1–5) (Assembly Bill 333) became effective on January 1, 2022, while this appeal was pending. Assembly Bill 333 amended section 186.22, modifying the showing necessary to sustain gang offenses and enhancements.  It also created section 1109, which provides for the bifurcation of alleged gang enhancements and any charge of actively participating in a criminal street gang.

Prior to trial, the parties agreed to apply Assembly Bill 333 even though it was not yet effective.  Based on this agreement, the trial court bifurcated all gang charges and enhancements, but denied appellant's request to bifurcate the gang-murder special-circumstance allegation (§ 190.2, subd. (a)(22)).  Appellant contends this was error.

We disagree.  As another panel from this district explained in *People v. Montano,* section 1109, by its express terms, does not apply to gang-murder special-circumstance allegations.  (*People v. Montano* (2022) 80 Cal.App.5th 82, 113–114 (*Montano*).)  We decline to deviate from *Montano*.  But even assuming *Montano* was wrongly decided, any presumed error was harmless.

### A.    *Background.*

Appellant's trial began in October 2021.  Assembly Bill 333 was also enacted in October 2021, but would not become effective until January 1, 2022.  Despite this, the parties agreed to apply Assembly Bill 333 at trial.  This agreement included the substantive changes to section 186.22.  It also included the application of section 1109, which provides, in pertinent part:

11.

"(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

"(1) The question of the defendant's guilt of the underlying offense shall be first determined.

"(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement….

"(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22." (§ 1109, subds. (a), (b).)

In addition to the gang-murder special-circumstance allegation, the amended information alleged numerous gang enhancements (§ 186.22, subd. (b)(1)) and gang-related firearm enhancements (§ 12022.53, subd. (d)). Appellant and Gage were also charged with one count of active participation in a criminal street gang (§ 186.22, subd. (a); count 8). Pursuant to section 1109, the People agreed to the bifurcation of the substantive gang offense, gang enhancements, and gang-related firearm enhancements. However, the People objected to bifurcation of the gang-murder special-circumstance allegation (§ 190.2, subd. (a)(22)), based on the plain language of section 1109, which does not reference section 190.2. The prosecutor also argued that evidence of a gang motive was "inextricably intertwined" with the underlying murder charge, and bifurcation would prohibit the jury from learning why the murder happened. The trial court agreed and declined to bifurcate the gang-murder special-circumstance allegation.[3]

---

[3] Following trial, before the bifurcated proceeding could be held, the trial court granted the People's motion to dismiss the substantive gang offense, gang enhancements, and gang-related firearm enhancements.

**B.**    *Section 1109 Does Not Apply to Gang-murder Special-circumstance Allegations.*

Initially, we note the parties dispute whether section 1109 applies retroactively.[4] We need not address this issue because it does not affect our conclusion.[5]  As we explain, section 1109 does not require bifurcation of gang-murder special-circumstance allegations, and any presumed error in failing to bifurcate was harmless.[6]

In *Montano*, another panel from this district held that, based on the express language of the statute, section 1109 does not apply to gang-murder special-circumstance allegations.  (*Montano, supra,* 80 Cal.App.5th at pp. 113–114.)  There, the appellant argued that section 1109's silence on section 190.2 was a legislative oversight that leads to absurd results, because it effectively allows the prosecution to circumvent the bifurcation requirement by alleging gang-murder special circumstances.  (*Montano,* at p. 112.)  *Montano* disagreed, reasoning that judicially amending the statutory scheme would " 'violate the cardinal rule that courts may not add provisions to a statute.' "  (*Id.* at p. 113.)

Appellant acknowledges *Montano's* holding but urges us to conclude it was wrongly decided.   We are not persuaded.  Appellant contends that section 1109 is applicable because section 190.2, subdivision (a)(22), "incorporates section 186.22, subdivisions (a) and (b)(1) within its elements."  But this has no bearing on the express language of section 1109, which makes no mention of special circumstances allegations.

---

[4] The question of whether section 1109 applies retroactively to cases that are not yet final is currently under review by the California Supreme Court in *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743.

[5] Moreover, we are reticent to deny appellant's bifurcation claim on retroactivity grounds given that the parties agreed section 1109 applied retroactively.

[6] We also need not address respondent's contention that Assembly Bill 333 was an unconstitutional amendment to Proposition 21 (approved on March 7, 2000).  (See *People v. Rojas* (2022) 80 Cal.App.5th 542, 550, review granted Oct. 19, 2022, S275835.)

(See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1131 [" 'When interpreting statutes …
[i]f the language is unambiguous, the plain meaning controls.' "].)  Accordingly, we
reject appellant's position that *Montano* was wrongly decided, and conclude the trial
court did not err in declining to bifurcate the gang-murder special-circumstance
allegation.

**C.** *Any Presumed Error in Denying Appellant's Request to Bifurcate Was Harmless.*

Even assuming *Montano* was wrongly decided, and bifurcation was required, we
conclude any error was harmless.

We agree with the parties that the error is subject to the "reasonably probable"
standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  " 'Typically,
a defendant who has established error under state law must demonstrate there is a
reasonable probability that in the absence of the error he or she would have obtained a
more favorable result.' "  (*People v. Anzalone* (2013) 56 Cal.4th 545, 553; accord, *People
v. Epps* (2001) 25 Cal.4th 19, 29 [where the error "is purely one of state law, the *Watson*
harmless error test applies"].)  In assessing prejudice under *Watson*, "an appellate court
may consider 'whether the evidence supporting the existing judgment is so *relatively*
strong, and the evidence supporting a different outcome is so *comparatively* weak, that
there is no reasonable probability the error of which the defendant complains affected the
result.' "  (*People v. Rogers* (2006) 39 Cal.4th 826, 870.)

Here, the evidence establishing appellant's guilt of the underlying charges was
overwhelming.  Oliver identified appellant as the shooter.  She testified she left the party
on Reese Avenue with appellant and Gage, and that they directed her to the house on East
10th Street where appellant committed the shooting.  While appellant notes the
prosecution relied heavily on Oliver's testimony to convict appellant, her testimony was
strongly corroborated by other evidence.  Two other witnesses stated that Oliver,
appellant, and Gage were at the party, and Gage's fingerprint was found inside Oliver's

14.

Taurus. Surveillance video from a convenience store captured her car traveling northbound toward East 10th Street minutes before the shooting. Surveillance video from a nearby residence showed her car was used to carry out the shooting and is consistent with her description of appellant's conduct. Specifically, it showed her Taurus pass by the East 10th Street house, then return approximately two minutes later, consistent with her having made a U-turn at the end of the block. It also showed, as Oliver described, appellant lean his entire upper body out of the front passenger window.

Other evidence also independently connected appellant to the shooting. The .22-caliber cartridge casings recovered from the scene of the shooting were fired by the same gun that fired the cartridge casings recovered from inside of a Grand Cherokee; appellant's DNA was located inside of the Grand Cherokee. Two days after the shooting, an officer observed a subject removing a .22-caliber handgun from a bush near appellant's parents' house. Another officer briefly observed the subject, and testified the subject was "likely" appellant. Appellant had a clear motive to commit the shooting based on his membership in the CBC gang, its rivalry with the ESC gang, and his prior interactions over social media with King, an ESC gang member. Finally, when appellant was in a house surrounded by law enforcement, he sent messages asking that his friends not forget about him, evincing a clear consciousness of guilt. In light of this demonstrable evidence of guilt, there is no reasonable likelihood that the trial court's refusal to bifurcate affected the result of the trial.

Appellant argues reversal is required based on the inherently prejudicial nature of the gang evidence. We agree that evidence of gang membership and prior criminal acts inherently carries some risk that a jury will improperly infer that a defendant has a propensity to commit criminal offenses. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) However, nothing in Assembly Bill 333 or section 1109 "limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos* (2022) 77 Cal.App.5th 1116,

15.

1132.)  This includes evidence that is offered for identity, motive, or intent (among others) under Evidence Code section 1101, subdivision (b).

Here, the gang evidence was central to establishing appellant's motive for committing the shooting.  (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 ["Cases have repeatedly held that it is proper to introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent."]; *People v. Williams* (1997) 16 Cal.4th 153, 193 ["gang evidence is admissible if relevant to motive or identity"].)  Because it is very likely that at least some of the gang evidence admitted in appellant's trial would still have been admissible in a bifurcated trial, the potential for prejudice is significantly limited.  (See *People v. Hernandez, supra*, 33 Cal.4th at pp. 1049–1050.)

We also observe that the jurors were given a limiting instruction not to consider the gang evidence for any improper purpose, including that appellant "is a person of bad character or that he has a disposition to commit crime."  (See CALCRIM No. 1403.)  We presume the jury followed this instruction.  (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions [regarding considering gang evidence for a limited purpose], and there is nothing in this record to rebut that presumption."].)

Finally, any inference of prejudice stemming from the gang evidence is negated by the jury's acquittal of Gage.  This result demonstrates the jury was not simply overwhelmed by the presentation of the gang evidence, but that it closely and carefully examined the evidence supporting each allegation.  (See *People v. Ramos, supra,* 77 Cal.App.5th at pp. 1131–1132 ["It is apparent from this record the jury did not simply rely on the gang evidence to convict the defendants of the charged crimes."].)

Considering the strength of the evidence, the use of a limiting instruction, the acquittal of appellant's codefendant, and the overwhelming likelihood that some gang evidence would still have been admitted even if the gang-murder special-circumstances

16.

allegation had been bifurcated, it is not reasonably probable that the admission of gang evidence impacted the result of appellant's trial. Therefore, we conclude the trial court's failure to bifurcate pursuant to section 1109 was harmless under *Watson*.

## II. Substantial Evidence Supported the Jury's Gang-murder Special-circumstance Finding.

In addition to adding section 1109, Assembly Bill 333 amended the elements of the gang enhancement (§ 186.22, subd. (b)(1)) as well as the substantive gang offense of active participation in a criminal street gang (§ 186.22, subd. (a)). (See *People v. Cooper* (2023) 14 Cal.5th 735, 738.) This also changed the elements of the gang-murder special-circumstance allegation, which requires the People to establish the defendant was an "active participant in a criminal street gang." (§ 190.2, subd. (a)(22).)

Although the trial court applied Assembly Bill 333 at trial, appellant claims the evidence was still insufficient under the new law. He argues the People failed to establish the CBC gang was an "ongoing, organized association or group." (§ 186.22, subd. (f).) He also contends there was insufficient evidence that CBC gang members have engaged in "a pattern of criminal activity," because evidence of predicate offenses admitted at trial did not show they benefitted the gang in a manner that was "more than reputational." (*Id.*, subd. (e)(1).) Based on our review of the record, we conclude the evidence was sufficient to sustain the gang-murder special-circumstances finding.

### A. *Standard of Review*.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce

17.

from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

**B.** ***The Evidence Established the CBC Gang Met the Statutory Definition of a Criminal Street Gang.***

Prior to Assembly Bill 333, section 186.22, subdivision (f), defined a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal." (§ 186.22, former subd. (f).) Assembly Bill 333 changed that definition to: "an ongoing, *organized* association or group of three or more persons, whether formal or informal." (§ 186.22, subd. (f), italics added.)

Appellant argues this subtle change to the statutory language significantly narrowed the definition of a criminal street gang. He relies on a portion of the uncodified legislative findings to Assembly Bill 333, which states: "The social networks of residents in neighborhoods targeted for gang suppression are often mischaracterized as gangs despite their lack of basic organizational requirements such as leadership, meetings, hierarchical decisionmaking, and a clear distinction between members and nonmembers." (Stats. 2021, ch. 699, § 2, subd. (d)(8).) Based on this language, he claims the prosecution is now required to present evidence of the "organizational elements" of a criminal street gang, including its leadership structure and definition of membership.

We disagree that Assembly Bill 333 requires such a specific showing. "[A]n uncodified statement of purpose cannot substitute for operative statutory language." (*People v. Gentile* (2020) 10 Cal.5th 830, 849.) Uncodified findings and statements of intent may be used as an interpretive aid where the statutory language is ambiguous, but they do not "confer power, determine rights, or enlarge the scope of a measure." (*People v. Canty* (2004) 32 Cal.4th 1266, 1280; *People v. Birkett* (1999) 21 Cal.4th 226, 231–232.)

18.

Here, the only pertinent change Assembly Bill 333 made to the definition of a "criminal street gang" was the addition of the adjective "organized." (§ 186.22, subd. (f).) Nothing in the plain language of the subdivision requires proof of "organizational elements" like leadership structure, hierarchy, or membership requirements. If the Legislature intended to further expand the statutory definition of a "criminal street gang" to include these elements, it could have done so. Instead, the amended subdivision merely requires the People to show that the alleged criminal street gang was "an ongoing, organized association or group … whether formal or informal." (§ 186.22, subd. (f).)

Under the standard set forth in the statutory language, substantial evidence supported the jury's finding that the CBC gang met the definition of a criminal street gang. The People's gang expert explained that the CBC gang is comprised of over 300 members and has specific territorial boundaries. CBC gang members identify with the color powder blue and use distinctive hand signs and slogans to show allegiance to the gang. The CBC gang has an ongoing rivalry with another gang, the ESC gang. CBC gang members are expected to attack ESC gang members on sight, and to retaliate when other CBC gang members are attacked. In a statement to police, Oliver explained that as a member of the CBC gang, she was directed to fight female members of rival gangs and was used to perform reconnaissance in rival gang territory to gather information.

Additionally, the predicate offenses established that CBC gang members collectively engage in criminal activity. The People's gang expert explained that CBC members commit crimes together to instill fear in the community and rival gang members, which helps them commit additional crimes and avoid arrest and prosecution. Accordingly, the record conclusively supports the jury's finding that the CBC gang was "an ongoing, organized association or group of three or more persons, whether formal or informal," and this claim fails.

19.

C.    *Substantial Evidence Established the Predicate Offenses Benefitted the Gang in a Manner More Than Reputational*

Assembly Bill 333 now requires that, in order to show a pattern of criminal activity to establish the existence of a criminal street gang, the People must prove that the required predicate offenses "commonly benefited [the] criminal street gang" and that "the common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1).)

Appellant concedes the People's gang expert established the predicates commonly benefitted the CBC gang. However, he argues the People failed to demonstrate the predicate offenses benefitted the gang in a nonreputational way.

We disagree. As to each predicate offense, the People's gang expert provided a detailed explanation as to how each offense collectively benefitted the gang as a whole. Each of the predicate offenses involved the possession of firearms, and the gang expert testified that possession of firearms is critical to the gang given the ongoing war between the CBC gang and its rival. Firearms may be used for offensive purposes, either to attack rival gang members or commit other crimes, or for defensive purposes, to defend themselves or their territory against rival gang members. Accordingly, the record clearly supports the jury's finding that the predicate offenses benefitted the CBC gang in a manner that was more than reputational, and this claim lacks merit.

## III.    The Admission of Rap Videos at Trial was Harmless.

Prior to trial, the People moved in limine to admit four rap videos depicting appellant, Gage, and other CBC gang members. Appellant and Gage are not the artists in the videos—they do not personally rap or speak—but are present in some of the videos.

Appellant contends the rap videos were highly inflammatory, and the trial court's ruling admitting three of the four videos was an abuse of discretion under Evidence Code section 352. He also argues he is entitled to the retroactive application of newly enacted Evidence Code section 352.2, which creates a heightened standard for the admission of "a form of creative expression." (Evid. Code, § 352, subd. (a).)

20.

We need not address the merits of appellant's claims because appellant was not prejudiced by the admission of the rap videos. Any presumed error was harmless.

**A.    *Background***

The People sought to admit four rap videos, each of which was published on YouTube before the March 9, 2018, shooting. The videos take place at locations throughout Bakersfield that were known hangouts for the CBC gang. Each video is focused on a primary performer who raps throughout the video. The primary performer is surrounded by a group of approximately five to 20 other people who dance, pose, and make hand gestures. Some of the individuals wear clothing with colors and slogans consistent with CBC gang membership and make gang signs with their hands. Several were identified by law enforcement witnesses as active CBC gang members.

Lyrics to the videos include: "Better check yo' bitch cuz on the set, there ain't no checkin' me. Where ya'll n***as at? I'm in the field where the soldiers be," "We buying hollow tips by the case," and "Load up like the Army and shoot the shit up like that."

Gage is present in the rap videos titled "Country Till Death," and "Do That." In "Do That," Gage makes CBC gang signs with his hands. In "Country Till Death," Gage wears a powder blue T-shirt with a CBC gang slogan.

Appellant is present in the video titled "OBL." The video depicts 15 to 20 CBC gang members, and appellant can be seen waiving around a powder blue bandana and making gang signs with his hands. Rap lyrics from the video include: "Why ya'll run your mouth like we ain't got guns. Like we gonna cross Belle Terrace with them hot ones." The People's gang expert explained that Belle Terrace is the dividing line between CBC gang territory and ESC gang territory.

A fourth video, titled "3k9k11k" does not depict Gage or appellant. The video was filmed at a known CBC gang stronghold and depicts CBC gang members

brandishing firearms. According to the People's gang expert, the title of the video and its lyrics are expressions of disrespect toward the ESC gang.

Defense counsel for appellant and defense counsel for Gage contended that the videos should be excluded under Evidence Code section 352, arguing the violent lyrics and imagery are unduly inflammatory and prejudicial, and lack probative value because the lyrics do not reference the shooting in this case. The prosecutor countered that the videos were relevant to establish appellant's and Gage's membership in the CBC gang and knowledge of its activities, and to show that their participation in the gang was more than "passive or nominal." Additionally, the videos demonstrate the existence of a "violent rivalry" between the CBC gang and the ESC gang, which the prosecutor argued was critical to establishing the shooting was gang motivated.

The trial court excluded the "3k9k11k" video under Evidence Code section 352, reasoning it is minimally relevant because neither appellant nor Gage appear in the video, and is unduly prejudicial because it depicts "several weapons in a provocative manner." Instead, the trial court allowed the People to admit a screen shot from the video and describe its contents.

However, the trial court declined to exclude the remaining rap videos, stating:

> "The Court finds these videos demonstrate the existence of the gang itself in terms of numerous participants, its association with the color powder blue, the use of certain hand signs, and geographic locations with historical significance to the gang. As well, the videos are relevant to the prosecution's theory that the defendants are active CBC gang members.

> "These videos [are] being used to show both defendants involvement [in] the gang is more than passive or nominal. The total length of the videos is approximately less than 15 minutes. It is not cumulative as the prosecution is not using screen shots.

> "Considering arguments of counsel and the videos themselves, the Court finds [the videos] are neither minimally probative nor unduly cumulative. These videos are probative of both defendants' active

22.

participation and illustrative as to their knowledge of the CBC [gang] and neither unduly inflammatory nor unduly cumulative."

**B.** ***We Need Not Address Whether Evidence Code Section 352.2 Applies Retroactively or the Merits of Appellant's Evidence Code Section 352 Claim Because Any Presumed Error Was Harmless.***

While this appeal was pending, Assembly Bill No. 2799 (2021–2022 Reg. Sess.) (Stats. 2022, ch. 973, § 2), effective January 1, 2023, added section 352.2 to the Evidence Code. Subdivision (a) of Evidence Code section 352.2 states:

> "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."

Evidence Code section 352.2, subdivision (d), further provides that the admissibility of a form of creative expression be heard and determined in limine outside the presence of the jury, and the court "shall state on the record its ruling and reasons therefor."

There is currently a split of authority regarding whether Evidence Code section 352.2 applies retroactively to matters not yet final on appeal. (See *People v. Venable* (2023) 88 Cal.App.5th 445, 456 [Evid. Code, § 352.2 applies retroactively], review granted May 17, 2023, S279081; *People v. Ramos* (2023) 90 Cal.App.5th 578, 596 [Evid. Code, § 352.2 does not apply retroactively], review granted July 12, 2023, S280073.) The issue is currently being reviewed by our high court.

In the instant matter, we need not resolve whether Evidence Code section 352.2 applies retroactively because we conclude that appellant did not suffer prejudice.

23.

Accordingly, we need not address whether the trial court abused its discretion under Evidence Code section 352, or whether it would have admitted this evidence under the heightened standards required by Evidence Code section 352.2.

### C.     *Any Presumed Error Was Harmless.*

Appellant contends the videos' violent and misogynistic imagery and lyrics were highly inflammatory and could be used by the jury as evidence of appellant's character for violence and propensity to commit criminal offenses. He argues the videos were cumulative to other gang evidence and so much more prejudicial than probative that it raised a possibility that the jury would convict him even if the evidence did not establish his guilt. He claims the evidence establishing his guilt was not conclusive, and thus, absent the admission of the rap videos, the outcome of the trial would have been different.

In assessing error, appellant urges us to apply the more stringent standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Under *Chapman,* reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Ibid.*) Respondent, on the other hand, argues the "reasonably probable" standard of review set forth in *Watson* is appropriate. (*Watson, supra,* 46 Cal.2d at p. 836.)

We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because the error was harmless under either standard. As we explained above, the evidence conclusively demonstrated appellant was the shooter, and that the shooting was gang motivated. Oliver identified appellant as the shooter, and the surveillance videos, crime scene evidence, and testimony of other witnesses corroborated her testimony and connected appellant to the shooting. The evidence also conclusively established that appellant was an active CBC gang member when he committed the shooting. He previously admitted he was a gang member, had multiple gang tattoos, and

24.

his social media profiles contained numerous gang-related photographs and slogans.  He committed the shooting while in a car with two other active CBC gang members, and targeted King, an active member of a rival gang who he had previously sent a gang-related message to on social media.  Thus, even absent the rap videos, the record overwhelmingly established appellant's guilt.

Contrary to appellant's assertion, the People did not repeatedly emphasize or rely heavily upon the rap videos.  During closing argument, the prosecutor only briefly discussed the rap videos once as to each defendant and did so in context of describing the abundant evidence that the shooting was gang related.  He argued the videos and lyrics showed appellant and Gage were CBC gang members and highlighted the ongoing conflict between the CBC gang and ESC gang.  He did not reference the videos during rebuttal.

We also conclude the trial court's limiting instruction on gang evidence generally undermined any inference of prejudice.  In the instruction, the trial court specified that evidence of gang activity may only be considered for the limited purpose of deciding whether appellant "acted with the intent, purpose, and knowledge that are required to prove the gang-related special circumstance allegations," or to show that appellant "had a motive to commit the crimes charged."  (See CALCRIM No. 1403.)  We presume the jury followed this limiting instruction.  (See *People v. Franklin, supra,* 248 Cal.App.4th at p. 953.)  Moreover, the prosecutor echoed the language of this instruction during closing argument, stating:  "Now, how can the gang evidence be used?  Again[,] it can be used for the intent.  It can be used for knowledge.  And it can also be used for motive.  [¶] Why are they doing what they're doing?"  This further highlighted to the jury the limited purpose for which the gang evidence could be considered.

Gage's acquittal also makes the lack of prejudice clear.  Despite the considerable evidence establishing Gage's membership in the CBC gang, the jury nonetheless found Gage not guilty of extremely serious charges.  This shows the jury carefully considered

25.

the evidence against each defendant and was not overwhelmed by the allegedly inflammatory nature of the rap videos. (See *People v. Ramos, supra,* 77 Cal.App.5th at pp. 1131–1132.)

Given the overwhelming evidence that appellant was the shooter and that the shooting was gang related, and the People's limited reliance on the rap videos in establishing appellant's guilt, the guilty verdict rendered in this trial was surely unattributable to the purported error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Any inference of prejudice is dispelled by the jury instruction limiting the use of gang evidence, and by the jury's acquittal of Gage despite admission of the rap videos. Accordingly, we conclude beyond a reasonable doubt that the purported error did not contribute to the verdict, and this claim lacks merit. (See *Chapman, supra,* 386 U.S. at p. 24.) Likewise, it is not reasonably probable that the verdicts would have been more favorable to appellant absent this purported error. (*Watson, supra*, 46 Cal.2d at p. 836.) Any presumed error was harmless.

## IV. Appellant Fails to Establish a Violation of the CRJA Based on the Admission of Rap Videos at Trial.

In addition to his claims pursuant to Evidence Code sections 352 and 352.2, appellant contends the admission of the rap videos violated the CRJA. He characterizes the videos as "vehicles for presenting the jury with stereotypical depictions of African American males as consistently violent."

Preliminarily, we note that while this appeal was pending, the Legislature enacted Assembly Bill No. 1118 (2023-2024 Reg. Sess.) (Stats. 2023, ch. 464, § 1), amending section 745, subdivision (b) to allow an appellant to raise a claim alleging a violation of the CRJA "based on the trial record … on direct appeal from the conviction or sentence."

26.

(§ 745, subd. (b).)  Thus, although appellant did not raise a CRJA claim in the trial court, we reach the merits of appellant's claim on direct appeal.[7]

Effective January 1, 2021, the CRJA added section 745 to the Penal Code, which states, "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin."  (§ 745, subd. (a).)  Section 745 sets forth four categories, which, if proved by a preponderance of the evidence, establish a violation of the section.  (*Id*., subd. (a)(1)–(4).)  Appellant relies on only one of these categories, which states, "The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin."  (*Id*., subd. (a)(1).)

Section 745 does not define the terms "bias" or "animus," but specifies that the moving party is not required to prove "intentional discrimination."  (§ 745, subd. (c)(2).)  However, the legislative findings to the CRJA includes a non-exhaustive list of potentially violative statements or conduct, including "racially incendiary or racially coded language, images, and racial stereotypes," and suggestion that people of a certain race are "predisposed" to criminal conduct. (Stats. 2020, ch. 317, § 2, subds. (d), (e).)  The moving party has the burden of proving a violation of the CJRA by a preponderance of the evidence.  (§ 745, subd. (c)(2).)

We conclude appellant fails to meet this burden.  Appellant's claim is based solely on the admission of the rap videos at trial.  On the record before this court, we deduce no express or implied bias or animus by the prosecution or the court in the admission of the rap videos.

---

[7]    Assembly Bill No. 1118 will not take effect until January 1, 2024.  However, we elect to apply its amendments to section 745 because it will be effective before this matter is final on appeal.

27.

The People sought to admit the rap videos to establish appellant and Gage were active participants in the CBC gang, and to show the existence of a rivalry between the CBC gang and the ESC gang, which the People claimed was the motive for the shooting. For these purposes, the rap videos were undoubtedly relevant evidence, as being an "active participant in a criminal street gang" carrying out the murder "to further the activities of the criminal street gang" are elements of the gang-murder special-circumstances allegation. (§ 190.2, subd. (a)(22).) In total, the four videos were less than 15 minutes in length. As we explained above, the prosecutor did not rely heavily upon the content of the rap videos, nor argue they were relevant for any reason other than to establish the elements of the special circumstances allegation. Given the clear relevance of the rap videos, their relatively brief duration, and the purpose of which they were admitted, the record does not show that in seeking to admit the rap videos the prosecutor exhibited racial bias or animus toward appellant.

The record similarly shows no exhibition of racial bias or animus by the trial court. During motions in limine, the trial court carefully considered the probative value and potential prejudice of the rap videos, and fashioned an evidentiary ruling that balanced the parties' competing interests through the lens of Evidence Code section 352. It excluded one of the four videos because it did not include appellant or Gage and depicted several weapons in a provocative manner that was "unduly inflammatory." However, it concluded the remaining three videos were relevant to whether appellant and Gage were active participants in the CBC gang, and that the videos were not unduly prejudicial, inflammatory, or cumulative. Nothing in the trial court's ruling suggests it acted with racial bias or animus toward appellant.

To conclude, appellant fails to meet the burden of establishing the trial record demonstrates racial bias or animus by the trial court or prosecutor, even under the applicable preponderance of the evidence standard. The rap videos were relevant evidence, and their admission was subject to the trial court's thoughtful consideration of

28.

potential prejudice under Evidence Code section 352. Contrary to appellant's claim, the record does not show the rap videos served as "vehicles" for presenting the jury with stereotypical depictions of African Americans. We therefore reject appellant's assertion that the admission of the rap videos established a violation of the CRJA.

## V.    Sufficient Independent Evidence Corroborated Oliver's Accomplice Testimony.

Appellant contends his convictions should be reversed because Oliver's testimony was not sufficiently corroborated. He argues there was no independent evidence corroborating her testimony that he was the shooter, and thus, the evidence was insufficient to sustain his convictions.

### A.    *Background.*

It is undisputed that Oliver was an accomplice—the jury was expressly instructed as such. The jury was also instructed that it could not convict appellant based on the statements or testimony of an accomplice alone, and that it may only use such statements or testimony if corroborated by independent supporting evidence. (See CALCRIM No. 335.)

### B.    *Standard of Review.*

The jury's determination regarding corroboration is binding on appellate review unless the corroborating evidence does not reasonably tend to connect the defendant with the crime or should not have been admitted. (*People v. Nelson* (2011) 51 Cal.4th 198, 218.) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone." (*People v. Valdez* (2012) 55 Cal.4th 82, 147.) Such evidence must tend to connect the defendant with the commission of the offense, but it does not need to corroborate every fact to which the accomplice testified. (§ 1111; *People v. Perez* (2018) 4 Cal.5th 421, 452.) "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) The

evidence must be viewed in the light most favorable to the judgment, and witness credibility is not considered.  (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.)

### C.    *Oliver's Testimony Was Corroborated by Independent Evidence.*

We conclude the record contains ample corroborating evidence.  Appellant's DNA was found in a Grand Cherokee containing expended cartridge casings that were fired by the same firearm used in the shooting.  One of the casings was located on the right front passenger floorboard, and appellant's DNA was discovered on the interior front passenger door.  This suggested appellant had previously discharged the firearm used in the shooting or otherwise had access to it, thus independently connecting him to the shooting.

While this evidence alone provided sufficient corroboration of Oliver's testimony, other evidence at trial provided additional corroboration.  Independent witnesses testified that Oliver, appellant, and Gage were present at the party on Reese Avenue before the shooting.  Testimony of the People's gang expert established a gang-related motive for the shooting.  Appellant was a member of the CBC gang, the rival ESC gang was celebrating a "hood day," and appellant previously taunted King, one of the victims of the shooting, by sending him a gang slogan on social media.  Two days after the shooting, an officer observed a subject who he believed was appellant retrieve a .22-caliber firearm, the same caliber of weapon used to commit the shooting, from a bush near appellant's parents' residence.  Moreover, immediately prior to his arrest, while surrounded by the police, appellant sent messages on social media stating "Y'all N words don't forget about me," evincing a clear consciousness of guilt.

Appellant's argument focuses primarily on issues with Oliver's credibility, such as her prior inconsistent statements, admissions that she was untruthful with the police, and motive for testifying in light of her grant of immunity.  But the question of Oliver's credibility as a witness is not relevant to this inquiry.  Rather, our task is to determine

whether her testimony as an accomplice to the shooting was independently corroborated.
Given the DNA and firearms evidence, testimony of other witnesses, gang evidence, and
consciousness of guilt evidence, we conclude the record clearly supports the jury's
determination that independent evidence connected appellant to the crimes committed.
(See *People v. Nelson, supra,* 51 Cal.4th at p. 218.)  Accordingly, this claim lacks merit.

## VI. Section 3051 Does Not Violate Equal Protection by Excluding LWOP Offenders from Youth Offender Parole Eligibility.

Appellant was age 22 on the date of the shootings.  Because he was sentenced to
LWOP, he is statutorily ineligible for a youth offender parole hearing under section 3051,
subdivision (b)(4).  Appellant contends the exclusion of youthful offenders sentenced to
LWOP from youth offender parole consideration violates equal protection.  Relying on
*People v. Hardin,* he argues there is no rational basis for distinguishing between youth
offenders sentenced to LWOP and other youth offenders for purposes of section 3051.
(*People v. Hardin* (2022) 84 Cal.App.5th 273 (*Hardin*), review granted Jan. 11, 2023,
S277487.)  He seeks remand for resentencing, and should such relief be granted, a
hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261.[8]  We reject appellant's
claim and conclude the severity of the controlling offense provides a rational basis for
excluding LWOP offenders from youth offender parole consideration.

### A. *LWOP Offenders are Statutorily Ineligible for Youth Offender Parole Consideration.*

"[S]ection 3051 ... requires the Board [of Parole Hearings] to conduct a 'youth
offender parole hearing' during the 15th, 20th, or 25th year of a [youth] offender's
incarceration.  [Citation.]  The date of the hearing depends on the offender's

---

[8] At a *Franklin* hearing, a defendant "may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors." (*People v. Franklin, supra,* 63 Cal.4th at p. 284.)

' "[c]ontrolling offense," ' which is defined as 'the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.' " (*People v. Franklin, supra*, 63 Cal.4th at p. 277; § 3051, subd. (a)(2)(B).) At a youth offender parole hearing, the Board of Parole Hearings must consider "the diminished culpability of youth as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (§ 3051, subd. (f)(1).)

Under the tiered structure of section 3051, a person who was 25 years of age or younger at the time of the controlling offense is entitled to a youth offender parole hearing during the 15th year of incarceration if sentenced to a determinate term (§ 3051, subd. (b)(1)); during the 20th year of incarceration if sentenced to a life term of less than 25 years to life (§ 3051, subd. (b)(2)); or during the 25th year of incarceration if sentenced to a life term of 25 years to life (§ 3051, subd. (b)(3)). However, a person older than 18 years of age at the time of the controlling offense who is sentenced to LWOP is not eligible for a youth offender parole hearing. (*Id*., subd. (b)(4).)

**B.** *The Exclusion of LWOP Offenders Does Not Violate Equal Protection.*

"Both the state and federal Constitutions extend to persons the equal protection of law." (*People v. Chatman* (2018) 4 Cal.5th 277, 287.) Generally speaking, equal protection of the law means that no person or class of persons shall be denied the same protection of the law that is enjoyed by other persons or other classes in similar circumstances. (*People v. Guzman* (2005) 35 Cal.4th 577, 591.)

In assessing an equal protection claim, we must first consider whether the state has adopted a classification that affects similarly situated groups in an unequal manner. (*People v. Guzman, supra,* 35 Cal.4th at pp. 591–592.) For purposes of our analysis, we will assume without necessarily deciding that appellant has met this threshold requirement, and proceed directly to whether the classification is unconstitutional.

The parties agree, as do we, that appellant's claim is subject to a "rational basis" standard. "An equal protection challenge to a statute that creates two classifications of accused or convicted defendants, without implicating a constitutional right, is subject to a rational-basis analysis." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 184; see also *People v. Wilkinson* (2004) 33 Cal.4th 821, 838 [a defendant "does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives"].) Other courts that have addressed this claim have applied the rational basis standard. (See *Hardin, supra,* 84 Cal.App.5th at pp. 284–485; *People v. Ngo* (2023) 89 Cal.App.5th 116, 122 (*Ngo*), review granted May 17, 2023, S279458; *People v. Jackson* (2021) 61 Cal.App.5th 189, 200; *People v. Acosta* (2021) 60 Cal.App.5th 769, 779–780.)

Under rational basis review, "equal protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) We begin with the premise that this statute, once duly enacted, is presumed to be constitutional. (*Kimco Staffing Services, Inc. v. State of California* (2015) 236 Cal.App.4th 875, 884.) The unconstitutionality of this statute must be clearly shown, and we must resolve all doubts in favor of its validity. (*Ibid.*) To succeed under the rational basis standard, "the defendant must negate ' " 'every conceivable basis' " ' on which 'the disputed statutory disparity' might be supported. [Citation.] 'If a plausible basis exists for the disparity, "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." ' " (*People v. Acosta, supra,* 60 Cal.App.5th at p. 778.)

We conclude the Legislature has a rational basis to treat youthful offenders who are sentenced to LWOP differently from those sentenced to youth offender parole eligible offenses—the severity of the offense committed. An LWOP sentence is available for only a small number of crimes, and these crimes are deemed more morally depraved and injurious. (*People v. Acosta, supra,* 60 Cal.App.5th at p. 780.) "A person guilty of

murder with special circumstances is the worst of the worst. This is the most heinous crime known to our Penal Code, and one of the few crimes subject to the death penalty in California." (*Ngo, supra,* 89 Cal.App.5th at p. 123; see *In re Williams* (2020) 57 Cal.App.5th 427, 436 [LWOP sentences "are reserved for crimes of the most heinous nature"].) " 'It is the prerogative, indeed the duty, of the Legislature to recognize degrees of culpability when drafting a Penal Code.' " (*People v. Wilkinson, supra,* 33 Cal.4th at p. 840.) Thus, "[i]n excluding LWOP inmates from youth offender parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration." (*In re Williams,* at p. 436.) On this basis, almost all appellate courts have rejected the equal protection claim appellant raises here. (See *People v. Sands* (2021) 70 Cal.App.5th 193, 204–205; *People v. Morales* (2021) 67 Cal.App.5th 326, 347–349; *People v. Jackson, supra,* 61 Cal.App.5th at pp. 199–200; *People v. Acosta, supra,* 60 Cal.App.5th at pp. 779–781; *In re Williams*, at pp. 433–436.)

Appellant relies solely on *Hardin*, the only published opinion reaching a contrary conclusion. *Hardin* held that if the goal of section 3051 is to apply "youth-related mitigating factors to young adults up to the age of 26 … and thus to permit youth offenders a meaningful opportunity for parole if they demonstrate increased maturity and impulse control, then for that purpose there is no plausible basis for distinguishing between same-age offenders based solely on the crime they committed." (*Hardin*, *supra*, 84 Cal.App.5th at p. 288.) *Hardin* thus rejected "relative culpability" as a rational basis, reasoning that such a justification "is belied by the statutory provisions that allow such a hearing for individuals who have committed multiple violent crimes (albeit not special-circumstance murder) and were sentenced to a technically parole-eligible indeterminate state prison term that is the functional equivalent of life without parole." (*Id.* at p. 289.)

We respectfully disagree with *Hardin*. As explained in *Ngo*, which was decided after *Hardin*, section 3051 makes youth offenders eligible for parole at different points in their incarceration based on their underlying sentence, and therefore "cutting off the most culpable youthful offenders from parole entirely is not inconsistent with the goals of section 3051." (*Ngo, supra,* 89 Cal.App.5th at p. 125.) Moreover, contrary to *Hardin*'s analysis, "the 'rational basis' inquiry is *not* limited to the purposes of the challenged law," but can also be found in "other sentencing considerations." (*Ngo,* at p. 125.) Addressing *Hardin*'s reliance on situations where a special circumstances murder might be considered less culpable than a nonspecial circumstance murder, *Ngo* reasoned that equal protection allows for both incremental and incomplete regulation. (*Ngo,* at p. 126.) " ' "A classification is not arbitrary or irrational simply because there is an 'imperfect fit between means and ends' " [citation], or "because it may be 'to some extent both underinclusive and overinclusive' " [citation]. Consequently, any plausible reason for distinguishing between [two classes] *need not exist* in every scenario in which the statutes might apply.' " (*Ngo,* at p. 126, quoting *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 887.)

*Hardin* and *Ngo* are currently under review, and our Supreme Court is poised to resolve this issue presented here. In the interim, we agree with the People, *Ngo,* and the majority of appellate opinions that have addressed this equal protection claim. The severity of the offense required for an LWOP sentence provides a rational basis to distinguish between persons under the age of 26 sentenced to LWOP and persons under the age of 26 that are sentenced to a youth offender parole eligible offense. Appellant has not shown that section 3051 is clearly unconstitutional. (See *Kimco Staffing Services, Inc. v. State of California, supra,* 236 Cal.App.4th at p. 884.) The challenged distinction bears a rational relationship to some legitimate state purpose. (See *People v. Turnage*, *supra*, 55 Cal.4th at p. 74.) Therefore, this claim fails.

**VII.   Appellant's Cumulative Error Claim Lacks Merit.**

Appellant raises a claim of cumulative error.  "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."  (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)  A claim of cumulative error is essentially a due process claim.  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)  The test is whether the defendant received a fair trial.  (*Ibid*.)

We reject appellant's claim of cumulative error because we have denied all of his individual claims.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].)  Taking all of appellant's claims into account, we are satisfied he received a fair adjudication.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:


PEÑA, J.


MEEHAN, J.

36.